**Ramon LEAL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Victor LEAL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 835–86, 836–86.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 18, 1989.

Rehearing Denied Jan. 17, 1990.

Larry Zinn, San Antonio, for appellants.

Benjamin Euresti, Jr., Dist. Atty., and Edmund K. Cyganiweicz, Asst. Dist. Atty., Brownsville, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANTS' PETITIONS FOR DISCRETIONARY REVIEW

WHITE, Judge.

After a change of venue was granted to Hidalgo County from Cameron County, appellants pled not guilty and were convicted by a jury of murder and conspiracy to commit capital murder. The jury assessed punishment on each offense at five years imprisonment and a $5,000.00 fine. Appellants jointly appealed their convictions as one party, presenting twenty-five points of error to the Court of Appeals. This Court granted appellants' petition for discretionary review on four grounds for review. This Court also granted the appellants' supplemental petition on one ground for review.

The first ground for review in appellants' petition and the ground for review in their supplemental petition urge the same issue, whether the Court of Appeals erred when it held there was no reversible error in the trial court's denial of appellant's motion to elect as to counts.

The indictment charges both appellants in the first count with capital murder, while the second count alleges conspiracy to commit capital murder. At the commencement of the trial, the State reduced the first count against appellants to murder. At trial, appellants moved to require the State to elect the count on which they would proceed. The trial court denied that motion. Appellants raised this issue before the Court of Appeals.

Relying on *Ex parte Siller*, 686 S.W.2d 617 (Tex.Cr.App.1985),[1] the Court of Appeals reformed the judgment to show appellants guilty of murder only. The conviction and sentence for conspiracy was vacated and set aside. *Leal v. State*, 711 S.W.2d 702 (Tex.App.—13th Dist., 1986). The Court of Appeals explained that only one conviction and punishment may result because the indictments alleged two non-property offenses which arose from the same criminal transaction.

■■■ An indictment may not charge more than one offense. *Drake v. State*, 686 S.W.2d 935 (Tex.Cr.App.1985), and *Ex parte Broyles*, 759 S.W.2d 674 (Tex.Cr. App.1988). The State may not obtain multiple convictions on two or more counts in a single indictment alleging non-property offenses, regardless of whether they arose from the same or different transactions. *Fortune v. State*, 745 S.W.2d 364, at 370 (Tex.Cr.App.1988); and *Holcomb v. State*, 745 S.W.2d 903, at 905 (Tex.Cr.App.1988). Therefore, the trial court was without legal authority to enter judgment and impose sentence for more than one offense. *Drake v. State, supra*, at 944. For the reasons set out above, and not the reasons cited by the Court of Appeals, we reach the same conclusion as the Court of Appeals that misjoinder occurred and relief is appropriate.

Appellants contend in their supplemental brief that the Court of Appeals granted the wrong relief in the instant case. Appellants argue they are entitled to a reversal of both of their convictions because they objected to the improper joinder of the offenses. In this way, they seek to distinguish the instant case from the holdings in *Fortune, supra; Holcomb supra;* and *Ponder v. State*, 745 S.W.2d 372 (Tex.Cr. App.1988).

Essentially, appellants contend that the method of objection employed by their attorneys control the relief to be granted on appellate review: if counsel objected for the first time on appeal, the relief shall be reversal of all but the first conviction; however, if counsel objected at trial the relief shall be reversal of all convictions. Appellants cite no authority in support of this argument.

Appellants' argument confuses the ruling of this Court in *Fortune, supra*. The decision in *Fortune* relieved defense counsel of the necessity for making an objection to misjoinder at trial by labeling misjoinder a fundamental error. As Judge Teague wrote, this simplified the law of misjoinder by removing "weeds from the weedy opinion of *Ex parte Siller, supra*" and by overruling *Drake v. State*. *Fortune v. State, supra*, Teague, J., concurring at 371. This also provided defense counsel with the luxury of being able to lay behind the log in a trial without alerting the State or the trial court to the error in the State's pleadings. *Fortune v. State, supra*, Campbell, J., dissenting at 371–372. However, this decision did not permit defense counsel the additional luxury of selecting the method of relief their clients may receive on appellate review.

■■ In the instant case, the jury found appellants guilty, first, of murder and, second, of conspiracy to commit capital mur-

---

1. At the time of the Court of Appeals' decision, they did not have the benefit of the recent cases of *Fortune v. State*, 745 S.W.2d 364 (Tex.Cr.App. 1988); *Ponder v. State*, 745 S.W.2d 372 (Tex.Cr.

App.1988); and *Holcomb v. State*, 745 S.W.2d 903 (Tex.Cr.App.1988); and *Callins v. State*, 780 S.W.2d 176 (Tex.Cr.App.1989).

der. The jury assessed a five year prison sentence and fine on each conviction. The decisions of this Court indicate the appropriate relief calls for the reversal of one of the two convictions. *Fortune, supra,* at 370; and *Holcomb, supra,* at 908; and *Callins, supra,* at 180. The Court of Appeals in the instant case properly selected the second conviction for conspiracy as the one to be dismissed. *Holcomb, supra,* at 908.[2] Appellants' first ground for review in their petition, and the ground for review in their supplemental petition are overruled.

In their third ground for review, appellants contend the Court of Appeals erred when it found a tape recording was properly admitted into evidence even though it had not been translated from Spanish to English by a sworn interpreter.

In the instant case, appellants were convicted of plotting to kill, and hiring out the killing, of their brother-in-law, Dr. Narciso Cortez. Appellants allegedly contracted with their other brother-in-law, Enrique Chapa, to hire the killers and see that the job was done. Chapa recruited Wavil Lewis, Jr., who then recruited Frank Loftis to assist him. On August 31, 1982, Lewis shot Cortez to death outside Cortez's residence, and fled in a car driven by Loftis. Prior to the instant trial, Loftis, Lewis and Chapa confessed their crimes and agreed to testify for the State against appellants.[3]

On March 13, 1984, approximately one and one-half years after the alleged murder, Enrique Chapa met with appellant Ramon Leal at Ramon's insurance agency in Raymondville and at a Whataburger Res-

taurant in Raymondville. Chapa, in cooperation with law enforcement authorities, arranged the meeting so that his conversation with Ramon Leal could be recorded. To do this, Chapa wore a concealed microphone which transmitted the conversation to Joel Young. Young, a criminal investigator for the Texas Department of Public Safety, recorded the entire conversation on a reel to reel tape recorder. At trial, Young testified that his equipment was in working order on March 13th, that he heard the entire conversation, and that the tape being admitted into evidence was an accurate reproduction of the conversation which he heard. The conversation between Enrique Chapa and Ramon Leal was mostly in Spanish.

Appellants complained on appeal that the trial court erred when it admitted the tape into evidence without it being translated from Spanish to English by a sworn interpreter. At trial, after the court admitted the tape into evidence, the jury listened to the tape while reviewing a verbatim transcript of the conversation. Later, they listened to the tape again, this time with the assistance of an English transcript prepared by the prosecution.[4] At no time did the trial court swear in an interpreter to translate the recorded conversation.

The Court of Appeals noted that whether a tape recorded conversation in a foreign language may be admitted into evidence without a sworn translation into English is a question of first impression in Texas. The Court of Appeals stated a tape recording is not rendered inadmissible "merely because the conversation is spoken in a

2. In the cases of *Honc v. State,* 767 S.W.2d 787 (Tex.Cr.App.1989) and *Ex parte Broyles,* 759 S.W.2d 674 (Tex.Cr.App.1988), this Court reversed one of two misjoined convictions and remanded the other for reconsideration of punishment. However, neither of these cases controls the disposition of the instant appeal. In both *Honc* and *Broyles,* a single term of imprisonment was imposed for both convictions. *Honc,* at 789; *Broyles,* at 676. In the instant case, as in *Holcomb, supra,* and *Fortune,* separate penalties were imposed by the jury on each offense, distinguishing the instant case from *Honc* and *Broyles.*

3. Lewis received a life sentence, and the State agreed not to seek the death penalty against him. Loftis was granted immunity from prosecution for his testimony. Chapa's deal was for him to receive a ten-year sentence, with the adjudication of guilt deferred for ten years while he was on probation.

4. There was no testimony as to who actually translated the conversation for the prosecution. At trial, there were intimations that Enrique Chapa, an assistant district attorney, and an outside consultant prepared the English transcript. However, no one was positively identified as the translator in court. No one was sworn in by the trial court as an interpreter.

foreign language." The Court of Appeals concluded this situation is analogous to a trial in which a non-English speaking witness testifies, and that the safeguards of Art. 38.30, V.A.C.C.P.[5] apply. The Court of Appeals explained the trial court failed to interpret the tape through a sworn translator, even though the trial court had announced its intention to do so. *Leal v. State*, 711 S.W.2d 702, at 709 (Tex.App.—13th Dist.1986). However, the Court of Appeals concluded that "appellant waived any error which may have occurred by proceeding with a transcript instead of an interpreter when they failed to object to the dispensing of the transcripts, coupled with their waiver of any infirmities in the transcript when the tape was admitted into evidence." *Leal, supra,* at 710.

■ Initially, we hold that the Court of Appeals erred when it ruled that appellants waived the error by failing to object to the dispensing of the transcripts or to any infirmities in the transcripts.

When the State offered the tapes into evidence, it had provided the trial court a verbatim and an English transcript of the tapes. Appellants objected to errors and critical omissions in the State's English transcript of the conversation. Appellants also objected to not being given enough time to prepare their own transcript. The trial court indicated it would play the tape and bring the official interpreter up from Brownsville to translate for the jury. The trial court then decided the tapes would be admitted into evidence, but that the State's English transcript would not be admitted. The trial court would only permit the jury to use the State's transcripts as an aid while listening to the tapes.

When it became clear the trial court decided the tapes would be admitted into evidence, appellants objected again.

(Ramon's Counsel): Then we certainly object to any offering of the tapes unless there is a translation, an accurate translation made at the time the tapes are played.

Appellants suggested the trial court wait over the weekend, so that their expert, the State's expert, and the court's official interpreter could produce the best effort at translation. The State responded its translation was correct. The trial court decided to delay until the next morning, Friday, to give appellants time to prepare their own translation. Appellants responded that would be impossible to do in such a limited time.

On Friday, the trial court affirmed the procedure it would follow. The tapes would be played to the jury twice: the first time through, the jury would have the aid of the State's verbatim transcript; the second time through the jury would have the aid of the State's English transcript. The trial court made no mention of bringing the official interpreter in to court to make a contemporaneous translation.[6] Appellants made the following objections when the trial court announced this procedure:

(Ramon's Counsel): All of our objections that are in the record, may they go to each and every bit of this evidence.

COURT: All, right.

(Victor's Counsel): Your Honor, may the record reflect I join in those objections.

COURT: All right. Those were the objections to 85? (the tape)

(Ramon's Counsel): Yes, Your Honor. Can we have—All right, I think that's it.

That was the objections that have been made to 85 go—I'm reminded to tell the Court—to this testimony.

COURT: Yes, sir. That's what I said. The objections to 85 will be considered.

---

**5.** Art. 38.30, V.A.C.C.P. reads in part:
When a motion for appointment of an interpreter is filed by any party or on motion of the court, in any criminal proceeding, it is determined that a person charged or a witness does not understand and speak the English language, an interpreter must be sworn to interpret for him. . . .

**6.** There is no explanation in the record why the trial court failed to bring its official interpreter into the trial to translate the conversation as it was played back, instead of relying on the State's unsworn translation.

When the State reoffered the tape into evidence, appellants objected:

> (Ramon's Counsel): We reurge all of the objections previously made.
>
> COURT: All right.
>
> (Victor's Counsel): We join in reurging the objections made by Mr. Burnett and by myself.
>
> COURT: All right, 85 will be received.

Prior to the actual playing of the tapes, appellants again objected:

> (Victor's Counsel): I, of course, am not waiving any objection that I have to the tapes, those portions that mention my client.
>
> (Ramon's Counsel): Comes now the defendant, Ramon Leal, and in addition to the objections earlier made to the tape of the conversation between Ramon Leal and Enrique Chapa and object to the same for the further and additional reason and makes the following proffer to the Court:
>
> .  .  .  .  .[7]
>
> COURT: Objection be overruled.
>
> (Ramon's Counsel): All right. I guess that's everything we have, isn't it?
>
> (Defense Counsel): Yes, sir.
>
> (Ramon's Counsel): Has there been anything changed about the way you plan to do this?
>
> COURT: Not that I know of.
>
> (Ramon's Counsel): *We do not have to object any further in the presence of the jury?*
>
> COURT: *That's correct. I will take your objections as if they had been made in the presence of the jury.*[8]

The appellants preserved their objection to the admission of the tapes into evidence without a translation by a sworn interpreter. The Court of Appeals erred in holding otherwise.

On the other hand, several observations of the Court of Appeals are well taken. The admissibility of a tape recording of a conversation in a foreign language is a question of first impression in Texas. *Leal, supra,* at 709. The fact that this conversation was in a foreign language did not, in and of itself, render the tape recording inadmissible. *Leal, supra.* This situation is analogous to one where a non-English speaking witness testifies, and the safeguards of Art. 38.30 apply. *Leal, supra.* In the face of a proper motion or objection an interpreter must be sworn to translate the conversation, so long as the interpreter is "considered to possess adequate interpreting skills for the particular situation" and is "familiar with the use of slang" to the satisfaction of the trial court. Art. 38.30, V.A.C.C.P., and *Leal, supra.* We adopt these holdings of the Court of Appeals in the instant case.

The trial court did not comply with the procedures set out in Art. 38.30, V.A.C.C.P. An interpreter was not sworn in to translate the conversation for the jury. There is nothing that was admitted in evidence that would be an accurate translation of the Spanish conversation. Though the trial court and the jury relied upon an English transcript prepared by the State, there was no positive identification of who made the translation, there was no evidence they were qualified to make the translation, and there was no record that they were officially sworn to make the translation. To compound this problem even more, the alleged English translation was not admitted into evidence at trial.[9] The individuals who made the translation, whoever they were, were not called to the stand so that the accuracy of their work could be subject to cross-examination. We conclude that the trial court erred when it admitted the tape recording into evidence without it being translated from Spanish to

---

7. The additional reason, and proffer, constituted an objection to the State's subversion of Ramon's right to counsel by the taping of the conversation. This argument was not presented to this Court.

8. Emphasis added.

9. Each member of the jury was given a copy to read while listening to the tape. A copy was included in the record, and the Court of Appeals relied upon it in reviewing the sufficiency of the evidence against Ramon Leal.

English by a sworn interpreter. It was error for the trial court to use the State's unsworn translation to aid the jury.

■ Lastly, this Court must determine if the aforesaid error was harmless under Rule 81(b)(2), Tex.R.App.Pro. In *Harris v. State* (Tex.Cr.App., No. 69,366, June 28, 1989), this Court explained how the focus of 81(b)(2) analysis should be on the contribution of the error to the conviction or punishment. The "concern is solely to trace the impact of the error," which necessitates an examination of the error's interaction with other evidence. This analysis involves more than simply examining "whether there exists overwhelming evidence to support the appellant's guilt." The reviewing court should "be concerned with the integrity of the process leading to the conviction." *Harris, supra.*

In the instant case most of the evidence against Ramon Leal came from an accomplice to the crime, Enrique Chapa. In affirming Ramon's conviction on sufficiency grounds, the Court of Appeals found "the tape recording to be sufficient to corroborate the testimony of Enrique Chapa." *Leal, supra,* at 712.[10]

Setting aside the tape recording and the testimony of the accomplices, it cannot be said there was overwhelming evidence to support Ramon's guilt. The State's English translation, which was unsworn and unverified for accuracy, represented the only concrete and reviewable evidence of what was specifically said between Enrique Chapa and Ramon Leal. In fact, the Court of Appeals quoted liberally from that translation in its review of the facts. *Leal, supra,* at 711–712. There is little doubt that the erroneous admission of the tape recording made a significant contribution to the conviction of Ramon Leal.

Appellants did have the opportunity to put on evidence to contradict the State's translation of the conversation, and they took advantage of that opportunity. Ramon took the stand and gave his own version of what he and Enrique Chapa talked about. Ramon testified that: the agreement that he and Chapa discussed was Chapa's contract with his defense attorney; he said nothing to Chapa about the killing of Dr. Cortez; he said nothing to indicate he was aware that Chapa and his wife were in South Texas to kill Dr. Cortez in August of 1982; and that he never threatened Dr. Cortez with violence, or even considered violence against him.

Appellants also called Dr. Zavaleta, an expert in anthropology and lingustics, to testify about his opinion of the State's translation. Zavaleta said he had examined the tape repeatedly for two weeks ("I don't even care to remember how many times I've listened to it"). He noted the tape was not a continuous conversation, and that the participants employed code switching (a switching back and forth from English to Spanish). Zavaleta testified it is "almost impossible to interpret the meaning" of a conversation when the parties use code switching and there are gaps in the recording of the conversation, as there are in the instant case. Zavaleta concluded the task of interpretation is compounded even further when you have two people working at cross purposes in the conversation and where you cannot view the body language of the two people.

Lastly, it must be noted that the State relied heavily on the tape recording and its translation in final argument. The state's attorney informed the jury that he would be playing parts of the tape during his argument while showing them charts of what the tape is saying. Ramon's counsel objected, to no avail, that this permitted and encouraged the jurors to rely on a

---

10. The Court of Appeals also discussed motive of Ramon Leal as a factor tending to connect Ramon with the murder of Narciso Cortez. Specifically, the Court of Appeals recounted a history of financial squabbles between Ramon and the deceased culminating in Cortez's suit for a forcible entry and detainer against Ramon and the land Ramon lived on near Raymond-

ville. *Leal, supra,* at 712. However, the Court of Appeals did not mention Ramon's motive as corroboration of Chapa's testimony in their holding set out above. It appears the Court of Appeals thought the tape recording to be critically important to the corroboration of Chapa's testimony regardless of the circumstantial evidence of Ramon's motive.

transcript that was not in evidence. Ramon's counsel also objected there was never any official testimony as to a translation of the Spanish in the tape. The trial court overruled this objection too, and permitted the State to continue its argument.

After reviewing the importance of the erroneous admission of the tape recording to the State's evidence of Ramon's guilt, including its use in final argument, this Court cannot conclude that appellants' arguments against the translation preserved the integrity of the process leading to Ramon's conviction. We hold the erroneous admission of the tape recording[11] was not harmless. *Harris, supra.* Appellants' third ground for review is sustained.

In appellants' fourth ground for review, they argue the Court of Appeals erred in finding sufficient evidence to corroborate the testimony of Enrique Chapa with regard to Ramon Leal. At trial two accomplices testified as follows: Enrique Chapa testified that when he arrived in the Rio Grande Valley on August 26th, Ramon Leal showed him where Dr. Narciso Cortez lived and worked, as well as some bars that Dr. Cortez frequented, all as potential sites for the planned murder; and Wavil Lewis testified that later that evening, he saw Ramon Leal dropping Enrique Chapa off at the hotel where the hired killers were staying. It is Chapa and Lewis' testimony which the State had the burden to corrob-

orate to prove the guilt of Ramon Leal beyond a reasonable doubt.

■ In determining the sufficiency of the evidence to corroborate the testimony of accomplices, we eliminate from consideration the accomplices' testimony, in the instant case that of Enrique Chapa and Wavil Lewis, and examine the remaining evidence to ascertain whether it independently tends to connect Ramon Leal to the commission of the murder of Dr. Narciso Cortez. *Killough v. State,* 718 S.W.2d 708 (Tex.Cr. App.1986); *Gardner v. State,* 730 S.W.2d 675 (Tex.Cr.App.1987); *Reed v. State,* 744 S.W.2d 112 (Tex.Cr.App.1988); and *Jackson v. State,* 745 S.W.2d 4 (Tex.Cr.App. 1988).

■ After eliminating from consideration the testimony of Chapa and Lewis, the only evidence at trial to connect Ramon Leal to the killing of Dr. Cortez were the tape recording and Ramon's alleged motive. Earlier, we held the tape recording was erroneously admitted without an official sworn translation from Spanish to English over appellants' timely objection. As such, we shall not consider the tape recording in our review of the sufficiency of the corroboration of the accomplices.[12] In our analysis of the third ground for review, we noted the Court of Appeals placed great importance on the taped conversation when it held there was sufficient evidence to corroborate the accomplices' testimony.

---

11. Though admission of a tape recording of a conversation in a foreign language is a question of first impression in Texas, it is a question which has been confronted and resolved in several of the Federal circuits of the country. Those appellate courts have generated procedures for the admission of tapes which are well taken.

Initially, the District Court and the parties involved must make an attempt to produce an official or stipulated transcript which satisfies all sides. If an agreed or stipulated transcript cannot be produced, then each side should produce its own version of a transcript, or its own version of the disputed portions of the transcript, or one transcript could contain both versions; and the tape could be played twice, once with each version. Each side may put on evidence supporting the accuracy of its own version, or the inaccuracy of the opposing party's version, in any of the proceedings in which the jury is told a disagreement exists. *United States*

*v. Onori,* 535 F.2d 938, at 948–949 (5th Cir. 1976); *U.S. v. Llinas,* 603 F.2d 506, at 509 (5th Cir.1979), *cert. denied,* 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980); *U.S. v. Cruz,* 765 F.2d 1020, at 1023 (11th Cir., 1985); *U.S. v. Rosenthal,* 793 F.2d 1214, at 1237 (11th Cir., 1986); *U.S. v. Zambrana,* 841 F.2d 1320, at 1336 (7th Cir.1988); *U.S. v. Zambrana (II),* 864 F.2d 494, at 498 (7th Cir.1988); and *U.S. v. Rengifo,* 789 F.2d 975, at 983 (1st Cir., 1986).

12. Even if we only eliminated the unofficial, unsworn, and unadmitted translations of the taped conversation from consideration, all we would be left with is a taped conversation in a foreign language where there are gaps in the recording of the conversation. Therefore, there is nothing in the record in a language this Court understands to show that Ramon Leal and Enrique Chapa discussed Ramon's involvement in, and contributions to, the plot to kill Dr. Cortez.

Without the taped conversation, all we are left with is Ramon's alleged motive to kill Dr. Cortez.

The evidence of Ramon's motive is all circumstantial. Without going into unnecessary detail, it can be said there was animosity between Ramon and Dr. Cortez over a family land squabble which culminated in Dr. Cortez's lawsuit against Ramon for an accounting of profits and a forcible entry and detainer lawsuit against Ramon. The accounting was pending at the time of Dr. Cortez's death, after which his wife dismissed the action against her brother Ramon. The Court of Appeals stated that "motive is a factor that may also be considered with other evidence tending to connect the accused with the crime," citing *Paulus v. State*, 633 S.W.2d 827 (Tex.Cr.App.1982). *Leal, supra,* at 712.

Evidence of motive, alone, cannot be sufficient to corroborate the testimony of an accomplice witness. *Reynolds v. State*, 489 S.W.2d 866 (Tex.Cr.App.1972). In *Paulus, supra,* at 846, this Court held that to be sufficient, corroboration must be considered with other evidence tending to connect the accused with the crime.

In the instant case, Ramon's alleged motive to kill Dr. Cortez stands alone as the State's corroboration for the testimony of Chapa and Lewis. After excluding the tape, the evidence left in the instant case is insufficient to corroborate the accomplice witness testimony against Ramon Leal. Appellants' fourth ground for review is sustained. Ramon Leal's conviction for murder is reversed and an acquittal is ordered.

In appellants' fifth ground for review, they argue there was insufficient evidence to corroborate the accomplices' testimony with regard to Victor Leal. At trial, the accomplices Enrique and Magdalena Chapa [13] testified that Victor Leal telephoned them in Dayton, Ohio on August 10, 1982 to confirm that he wanted Enrique to ar-

range for the hiring of men to kill Dr. Cortez. They testified that other calls were made between themselves and Victor to finalize the arrangement. They testified that Victor payed only $10,000 of the $20,000 contract on the day after the murder, but that he sent personal checks to them later to complete his payment for the services rendered. It was this accomplice testimony which the State had the burden to corroborate to prove the guilt of Victor Leal beyond a reasonable doubt.

The State sought to corroborate the testimony of the Chapas in three ways. First, the State admitted into evidence three checks totalling $5,000 [14] from Victor Leal to the Chapas. All three checks were dated during October and November of 1982. Second, the State admitted into evidence telephone records of Victor Leal and the Chapas to show interstate telephone calls from Victor's residence to the Chapas' residence in Dayton, Ohio. Lastly, on cross-examination, Victor admitted he helped finance a lawsuit against Dr. Cortez and that he felt animosity towards Dr. Cortez. The Court of Appeals concluded this evidence was sufficient to corroborate the accomplice testimony. *Leal, supra,* at 713.

To determine if this evidence was sufficient to corroborate the accomplices' testimony, we eliminate from consideration the testimony of Enrique and Magdalena Chapa, and examine the remaining evidence to determine whether it independently tends to connect Victor Leal to the commission of the murder of Dr. Cortez. *Killough, supra; Gardner, supra; Reed, supra;* and *Jackson, supra.*

We cannot conclude that the State's corroboration tends to connect Victor to the murder of Dr. Cortez. The checks, on their face, are payments of $5,000 to the Chapas, and are marked as loans in the memo portions of the checks. The telephone records show only that calls were made from Victor's residence to the

---

**13.** The trial court instructed the jury in its charge that both Enrique and Magdalena Chapa were accomplices.

**14.** Payment of the other $15,000 of the contract price was in cash from Victor to the Chapas, as established by the testimony of the accomplices Enrique and Magdalena Chapa.

Chapas, and vice versa. There is no evidence aside from the accomplices as to who was involved in the conversations or what the topics of conversation were. The evidence of motive, Victor's animosity towards Cortez, must be associated with other sufficient corroboration to establish Victor's guilt. *Paulus, supra,* at 846. At most, we can conclude that this evidence tends to connect Victor Leal to an association with the Chapas. The record clearly shows a close family connection, Magdalena Chapa is the sister of Victor Leal. It is not uncommon for a brother to call his sister and vice versa. Unlike the overwhelming weight of corroborative evidence in *Jackson, supra,* and *Paulus, supra,* the State's corroboration does not tend to connect Victor Leal to the murder of Dr. Narcisco Cortez.

Appellant's fifth ground for review is sustained. Victor Leal's conviction for murder is reversed, and an acquittal is ordered. *Ex parte Reynolds,* 588 S.W.2d 900 (Tex.Cr.App.1979), cert. denied, 445 U.S. 920, 100 S.Ct. 1284, 63 L.Ed.2d 605.

The judgment of the Court of Appeals is affirmed in part and reversed in part.

McCORMICK, P.J., states, "Because I believe the Court of Appeals was correct in the disposition of this cause, I dissent to the action the majority takes today."

CLINTON, J., concurs in the result.

TEAGUE, Judge, concurring.

Contrary to the holding by the court of appeals, see *Leal v. State,* 711 S.W.2d 702, 709 (Tex.App.—Corpus Christi 1986), that "We do not believe a tape recording is rendered inadmissible merely because the conversation is spoken in a foreign language," which this Court adopts, (page 849, majority opinion), "All persons are charged with notice that for crimes committed against the laws of this State, the trial will be conducted in the English language and that for non-English-speaking witnesses the law has made provision for the translation of their testimony by interpreters into the English language...." *Garcia v. State,* 151 Tex. Crim. 593, 210 S.W.2d 574, 580 (1948).

Also see *Livar v. State,* 26 Tex.App. 115, 9 S.W. 552 (Ct.App.1888). It was not until the Legislature enacted the provisions of Art. 38.30, V.A.C.C.P., effective January 1, 1966, that an accused non-English speaking person, on motion, had the right to have an interpreter to interpret the proceedings for him. See *Ex parte Nanes,* 558 S.W.2d 893 (Tex.Cr.App.1977).

Thus, whether a State's witness, who cannot speak the English language, is tendered as a witness, or whether the witness is going to interpret a document or recording from one foreign language to the English language, before such testimony or evidence becomes admissible, on motion of the defendant, it is necessary that the trial court obtain the services of a qualified interpreter, other than counsel, to interpret the matter for the defendant. In this instance, the complained about tape recording was *improperly admitted into* evidence because it had not been interpreted or translated from Spanish to English by a qualified, sworn interpreter. It amounts to no evidence.

Although the majority opinion correctly holds that the error was not harmless, i.e., there is not a reasonable doubt that the error made no contribution to the conviction, see Rule 81(b)(2), *Rules of Appellate Procedure,* I find that the kind of error that occurred in this cause is so fundamental that the harmless error doctrine is inapplicable to this kind of error.

Without being able to consider the accuracy of the tape recording, the tape recording amounts to no evidence. Thus, the judgment of this Court should read that it is reversing the judgment of the court of appeals and remanding the cause to the trial court for that court to enter judgments of acquittal on behalf of each appellant.