■ Comer's third and final point asserts that the trial court erred in admitting Comer's written statement into evidence since the statement was obtained while he was in custody in violation of Tex.Fam. Code Ann. § 52.02(a)(2), (3) (Vernon 1986). That section reads as follows:

Bryan O'Neil COMER, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 12–87–00032–CR, 12–87–00033–CR.

Court of Appeals of Texas, Tyler.

Feb. 28, 1990.
Rehearing Denied May 10, 1990.

OPINION ON REMAND

RAMEY, Chief Justice.

Appellant, Bryan O'Neil Comer, was charged with capital murder in two separate indictments. Tex.Penal Code Ann. § 19.03(a)(2) (Vernon 1989). The offenses were subsequently consolidated and conviction by a jury was had in both causes. Tex.Penal Code Ann. § 3.02(a) (Vernon 1974). Due to the fact that he was under the age of seventeen at the time of the offense, punishment in both causes was assessed by the court at confinement for life. Tex.Penal Code Ann. § 8.07(d) (Vernon Supp.1990). The sentences were to run concurrently. Tex.Code Crim.Proc. Ann. art. 42.08(a) (Vernon Supp.1990). Appellant's convictions were affirmed by this Court in an opinion delivered January 15, 1988. The Texas Court of Criminal Appeals[1] reversed this Court's judgment, holding that appellant's written statement was taken in violation of Tex.Fam.Code Ann. § 52.02(a) (Vernon 1986), and remanded the cause for a harmless error analysis. On remand, we affirm.

Appellant's written statement read as follows:

My name is Bryan O'Neil Comer. I am sixteen years of age. My date of birth is April 1st, 1969. I am in the 11th grade at Sabine High School. I can read and write the English language. I am employed at the Del Taco restaurant in Kilgore.

Last Friday, February 7th, 1986, I went to school at 7:30 a.m. I live at No. 5 Kingman Circle in Pimlico Park in the Liberty City area. It is about a mile or a mile and a half from my house to school.

I left school last Friday at about 12:15 and went home. I went in the house and drank a coke and ate a ham and cheese sandwich. I stayed there until about 12:40 and then I went to Kilgore. I didn't stop in Kilgore, and I went to the Rolling Meadows Addition down from a wrecking yard to the Smiths' house. I know the last name because I was there

James R. Moore, Beverly Bass, Longview, for appellant.

Gregory Neeley, Akin, Steele & Bush, Longview, for appellee.

1. *See Comer v. State,* 776 S.W.2d 191 (1989).

two days before on Wednesday helping Kelvin Horn and Dennis—I don't know his last name, but we call him Weasel—put some posts up for Mr. Smith. They live in a trailer house that belongs to Mr. Smith, and they were putting up posts to help pay for the rent.

I had seen some crossbow arrows in Mr. Smith's tin shed that day, and I went back on Friday to try to buy some arrows. I parked in their driveway by the Smiths' car and pickup truck and got out of my car and knocked on the door. I have a 1980 gray Chevrolet Chevette. Mrs. Smith came to the door.

She remembered me from Wednesday and asked me how I was doing. I told her that I wanted to see about buying some arrows. She took me out to the tin shed where the arrows were, and she unlocked the door and set the lock on the side. We went in the building, and she got the arrows from on top of the table. When Mrs. Smith was getting the arrows, I picked up a ball-peen hammer and hit her in the head twice. Mrs. Smith fell on the floor.

Then I went into the house, and Mr. Smith was in the back right bedroom on the telephone talking to someone about some fence posts. I stayed in the kitchen, but I could hear Mr. Smith on the telephone. A few minutes later Mr. Smith came into the kitchen. I was standing near the icebox with the hammer in my hand. Mr. Smith asked me if we found the arrows, and that is when I hit him with the hammer. I hit him in the head three times. He fell down by the stove.

I took Mr. Smith's billfold off the bar in the kitchen. It was a dark-colored billfold that folded one time. Then I went into Mr. Smith's bedroom and took a bunch of change off the top of a jewelry box. The jewelry box was wooden. It had an indention on the top of it. I then went into the back left bedroom and put the hammer under the mattress of the bed and set the bedspread on fire. I

used a white throw-away lighter to set it on fire with. I set another bed on fire, and I don't remember which it was.

Then I got in my car and left. I went to Kilgore to the Del Taco mexican restaurant and talked to the manager, Ernest Cook, about my check. I got $40 out of Mr. Smith's billfold while I was at Del Taco, and I threw the billfold with Mr. Smith's driver's license and some other papers into the trash can on the inside in front of Del Taco. Then I went to State Farm Insurance office across from 96X Radio Station in Kilgore where my mother works and I talked to my mother for a few minutes.

Then I went to the Mobil station across from Piggly–Wiggly in Kilgore and got my car washed. While I was at the car wash, I told a black guy who I know as "Moon" what I had done. Then I went home. Since that time, I told a friend of mine name "Torrey" about what I had done. I got a bunch of stuff to eat and put gas in the car with the money that I had got from Mr. Smith. I got home just before five o'clock that day, and my dad and I jacked my car up to check the brakes. Then Torrey and I went to Kilgore to Tracey Lackey's house. Tracey is sort of my girl friend.

This is all that I can remember what happened. I have not been promised anything in return nor threatened in any way to make this statement. I have given this statement to Captain Larry R. Smith and Lieutenant Hartley of my own free will. I further state that I have waived each of the rights set out at the beginning of this interview and was aware of those rights the entire time that the above statement was given.

The statement is signed by the appellant and certified by Judge Robert Malcolm.[2]

▮ When error is found to exist in a trial, the reviewing court is to conduct a harmless error analysis to determine whether it constitutes reversible error. Such a determination is made pursuant to the test set forth in Tex.R.App.P. 81(b)(2), which provides:

**2.** At the time the statement was taken, Judge Malcolm was Justice of the Peace for Gregg County, Texas.

(b) Reversible Error.

. . . .

(2) *Criminal Cases.* If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

■ The Court of Criminal Appeals has recently provided some guidance on the Rule 81(b)(2) analysis. In *Harris v. State,* 790 S.W.2d 568 (Tex.Cr.App.1989), the court stated that the focus of Rule 81(b)(2) is on the error and its contribution to the conviction or punishment. Our concern is solely to trace the impact of the error, not to weigh the proper evidence or examine the other evidence to see if it is cumulative of the improper evidence. *Id.* We must, however, examine the error's interaction with the other evidence. *Id.* For example, in *Leal v. State,* 782 S.W.2d 844 (Tex.Cr. App.1989), the improper evidence was the only evidence that corroborated the accomplice testimony and the State relied heavily on it in final argument. As a result, the Court found the error harmful. *Id.*

■ The task before us is not simply to determine whether the other evidence of guilt is overwhelming. *Harris,* at 587. However, overwhelming evidence may dissipate "the error's affect upon the jury's function in determining the facts so that it did not contribute to the verdict. . . ." *Id.*

■ The procedure set out by the Court in *Harris* is to first isolate the error and all its effects, and second, to decide whether a rational trier of fact might have reached a different result if the error and its affects had not occurred. *Harris,* at 587–88. Considerations in the first step include: (1) the source of the error, (2) the nature of the error, (3) whether or to what extent it was emphasized by the State, (4) its probable collateral implications, (5) how much weight a juror would probably place on the error, and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.* at 587–88.

■ The erroneous evidence in this case was the appellant's confession to the murders. The confession was improper evidence because the law enforcement officers detained appellant in violation of Tex.Fam. Code Ann. § 52.02(a) (Vernon 1986), even though appellant was twice informed of his rights under Tex.Fam.Code § 51.09(b) by the justice of the peace before his signing the confession. *Comer,* at 196–97.

At trial, prior to introducing the evidence, the State put on three witnesses to whom appellant had, shortly after the crime, related his beating and robbing of an elderly couple. Those witnesses testified that they learned from Appellant: (1) the location of the crime was a house in the Rolling Meadows area where there was a garage sale, (2) the victims were an elderly man and woman, (3) the victims had an ongoing garage sale, (4) appellant had beaten the victims in the head with a hammer, (5) appellant had robbed the victims, (6) appellant set the victims' house on fire, and (7) that on the afternoon the murders occurred, appellant's jacket was splattered with what appeared to be blood. These facts were borne out by other evidence in the record.

Other witnesses testified that appellant knew the victims before the offense. A Department of Public Safety serologist testified that spots of human blood on appellant's jacket were of the same type as the victims' blood. There was evidence that a hammer recovered at the scene had human blood on it. This evidence was in the record before the confession was admitted and read to the jury.

In final argument, the State initially did not even mention the confession. After defense counsel argued that the State had not shown appellant intended to kill the victims, the State responded:

[D]id he tell the officers, oh, it was a mistake, I didn't mean to kill them? No. Does that statement have one word in there that says, I didn't mean to kill them; it was an accident; I didn't mean to hit them so hard; I didn't know what I was doing? No, it doesn't say that. And you know why it doesn't say that, because he intended to do it.

At no other time was the confession mentioned by the State.

In light of the order in which the State obtained and presented the evidence, the entirety of the evidence other than the written confession, including appellant's oral confessions to three individual witnesses, and the degree of emphasis by the State on the confession as proof of the offenses, we are confident that any effect the improper evidence might have had was dissipated and did not contribute to the verdict. Further, we do not believe that declaring the admission of the confession to be harmless in this case would encourage the State to violate the Family Code mandates in the future. As the Court of Criminal Appeals said, "We do not imply that the officers willfully violated the law in this case." In fact, the record shows they diligently informed appellant of his rights and saw that he was warned by the justice of the peace before questioning him and before he signed the confession.

We conclude beyond a reasonable doubt that the introduction of appellant's written statement, albeit erroneous, did not contribute to his conviction or punishment.[3]

The judgment of the trial court is affirmed.

---

**3.** Punishment was not an issue. Once the jury returned their verdict of guilty of capital murder, the only possible punishment in this case was life imprisonment because appellant was younger than 17 years of age when he committed the crimes. Tex.Penal Code Ann., § 8.07(d) (Vernon Supp.1990).