

**NUMBER 13-10-00650-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MARY GRIGSBY,                                                                          Appellant,

v.

THE STATE OF TEXAS,                                                                    Appellee.

**On appeal from the 130th District Court
of Matagorda County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Vela
Memorandum Opinion by Justice Garza**

Appellant, Mary Grigsby, was convicted of capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(3) (West Supp. 2011). Because the State did not seek the death penalty, Grigsby was sentenced to life imprisonment without parole. *See id.* § 12.31(a)(2) (West 2011). By three issues on appeal, Grigsby argues that the trial court

erred by: (1) admitting "overview" testimony; (2) admitting evidence of extraneous offenses; and (3) failing to submit a jury instruction on the accomplice-witness rule. We affirm.

## I. BACKGROUND

Appellant met Jack Grigsby in 1992 and married him in 1996. In 2003, appellant filed a divorce petition, but the petition was dismissed after the couple reconciled. Also in 2003, appellant met Daniel Harrison, who at the time was living with appellant's friend Susanne Matz. According to Harrison, appellant called him the day after they met and asked to talk to him alone "about a personal matter"; Harrison agreed. When they met, appellant informed Harrison that she wanted to have Jack killed, and she asked if Harrison knew anyone who could do the job.[1] Harrison told appellant that he knew "quite a few people" who could do so and estimated that it would cost appellant $10,000. According to Harrison, appellant said she could get the money. Harrison then took appellant's telephone number but did not call her back because he had decided that he "[d]idn't want to get involved."

Matz, a pharmacist, became close friends with appellant when the two worked at a Wal-Mart mail order center from around 1999 to 2002. According to Matz, appellant once asked her if she knew anyone that could kill her husband, but Matz did not believe appellant was serious. Appellant also asked Matz whether an increased dose of Klonopin—a muscle relaxant that Jack was taking at the time—could be fatal. Again, Matz did not take appellant seriously.

---

[1] Harrison agreed that, at the time, he "appear[ed] to be somebody that might know someone who could [commit murder for hire]" because he had "real long hair, a beard, cut-off sleeves," and was "hanging with a biker association."

2

Appellant filed a second divorce petition in 2008, claiming that Jack had abused her verbally, physically, and emotionally. The divorce court rendered temporary orders which, in part, prohibited Jack from removing appellant as a beneficiary on his $200,000 life insurance policy. Subsequently, appellant moved out of Jack's house and became mired in financial difficulties.

In 2009, Harrison became reconnected to appellant when he sought help on his income taxes. Matz, knowing that appellant was experienced in keeping books and preparing tax returns, suggested that Harrison contact appellant. Harrison did so. According to Harrison, about twenty minutes into a telephone conversation about his taxes, appellant asked "whether he knew anyone who could take care of what we talked about before." Appellant explained that divorce proceedings were ongoing but that she would pay the $10,000 out of her share of Jack's life insurance proceeds. This time, Harrison accepted the job himself. Harrison and appellant agreed to meet at a later date to work out the details.

Harrison later traveled to Brazoria County to meet appellant at her Lake Jackson apartment. Harrison drove Matz's green Ford Taurus and, at one point, used Matz's Lone Star public assistance card. Harrison then drove with appellant to Sargent, where Jack resided, to familiarize himself with the area. On the way to Sargent, appellant described previous failed attempts she had made on her husband's life. They eventually agreed that the murder would take place sometime between May 13 and 16, when appellant was to be in Dallas for a convention.

Matz, Harrison, and appellant met on May 13 at the hotel in Dallas where appellant was staying. Harrison informed appellant that he did not own a gun, and so

appellant offered to let Harrison use an unregistered nine-millimeter Ruger semi-automatic pistol that she kept at her apartment. Appellant then had a duplicate of her apartment key made and instructed Harrison to pick it up at the front desk of her hotel. Harrison did so.

On May 17, Harrison drove to Lake Jackson using Matz's car. He went to appellant's apartment, retrieved appellant's pistol, then set out for Sargent. Upon arriving at Jack's residence, Harrison noticed that Jack was not home. To pass the time until Jack returned, Harrison visited a local convenience store and made a purchase with Matz's Lone Star card; he then waited near a set of boat slips and talked to a fisherman. Upon observing that Jack had returned home, Harrison approached the residence. He deceived Jack into letting him enter the house. He then struck Jack in the head with the pistol, and fired one shot into Jack's head, killing him instantly.[2] Harrison then returned to his Dallas-area home, disposed of the key to appellant's apartment, disassembled the pistol and threw the component parts into Lake Texoma.

Several days later, appellant drove to Jack's residence in Sargent, ostensibly to pick up a dog that she had left with Jack. She arrived to find Jack dead and lying in a pool of blood. She called 911. Patrol Sergeant Robert Pierce of the Matagorda County Sheriff's Office came to the scene, as did Fire Chief Jason Boyd and Sergeant Tommy Risinger of the Sargent Volunteer Fire Department. The first responders found

---

[2] Harrison recounted these events in chilling detail. He testified that, when he struck Jack in the head with the pistol, "[i]t split his skull. Blood went pretty much everywhere." Despite the force of the blow, Jack "took it, and he stood up and turned around and looked at me pretty surprised." Jack held up his hands in defense and asked: "What have I done to you?" Harrison testified: "I told him it wasn't for me, it was for his wife." After firing the pistol, Harrison saw "two full streams of blood squirt" from Jack's head. After leaving Jack's house, he called appellant to inform her that "it was a done deal." Appellant called back to confirm what Harrison had said; she then asked Harrison: "How's my dog?"

4

appellant in the front yard of Jack's house, crying and screaming that Jack had shot himself. She was later overheard telling other people that someone had "shot Jack." Risinger found appellant's behavior suspicious because there were "no tears, just hollering." Pierce observed that appellant "was not remorseful" and "had no tears in her eyes" at that time. Boyd stated that appellant's expression of grief seemed insincere and rehearsed. Further, Boyd found it suspicious that appellant would assume that Jack shot himself, considering that "[t]here was no indication that he had been shot when we got there" and there was no weapon found at the scene. Police were, however, able to recover a spent bullet casing and unused ammunition.

In a statement to police, appellant initially denied that she owned any firearms, then admitted that she owned a nine-millimeter pistol and that it was in her apartment as of the time she left for her convention in Dallas. Appellant consented to a search of her apartment; but, of course, the pistol was missing.

The day after the shooting, police were approached by Joe Zamora. Zamora explained that he had been fishing in Sargent the day before and recalled seeing a green Ford Taurus around Jack's home. Zamora told police that he spoke to the driver of the Taurus, and he assisted in producing a composite sketch of the driver. Police also recovered security video from a nearby convenience store which showed a man closely resembling the composite sketch, and the Taurus. A store clerk recalled that the man driving the Taurus had used a Lone Star card to make his purchase; police were able to trace this card to Matz and Harrison. Upon being questioned, Harrison admitted his involvement in Jack's death and told police of appellant's actions. Police retrieved security video from the Dallas-area hotel where appellant stayed; it showed appellant

5

dropping off an envelope at the front desk on May 16 and Harrison picking up the envelope the next day, thereby corroborating Harrison's story. Investigators also secured telephone records which showed a series of calls between appellant and Harrison on the days of May 16 and 17. Moreover, after appellant was arrested and jailed, she was recorded in phone conversations admitting that Harrison had been to her apartment in March 2009 to pick up money.

Calvin Story, a forensic firearms expert, testified that the markings on the nine-millimeter shell found at the scene were consistent with having been fired from a nine-millimeter Ruger.[3] He also concluded that the shell and some of the bullets found at the scene were made by the same manufacturer, and were of the same brand and caliber, as ammunition found in appellant's apartment.

Appellant was found guilty of capital murder and sentenced to life imprisonment without parole. This appeal followed.

## II. DISCUSSION

### A. "Overview" Testimony

By her first issue, appellant contends that the trial court erred by allowing "overview" testimony by Robert Thompson, an investigator with the Matagorda County Sheriff's Office and the lead investigator in this case. Thompson was the first witness called by the State, and he testified about various aspects of the investigation, including the recovery of evidence that, at that point, had not yet been admitted. He also opined about the truthfulness of Harrison, who had yet to testify. Appellant acknowledges that Thompson was "personally involved in several aspects of the investigation," but argues

---

[3] Story could not rule out the possibility that the bullet was fired by a different brand of nine-millimeter firearm.

6

that "his testimony went far beyond his personal acts and into specific acts performed by other deputies." She also contends that Thompson impermissibly opined about an "ultimate issue" in the case—whether the State corroborated Harrison's accomplice witness testimony with evidence tending to connect appellant to the offense. In support of this issue, she primarily cites *United States v. Griffin*, 324 F.3d 330, 348 (5th Cir. 2003).[4]

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard, and may not reverse the judgment if the trial court's decision is within the zone of reasonable disagreement. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). To preserve a complaint for appellate review, the record must show that a specific and timely complaint was made to the trial judge and that the trial judge ruled on the complaint. TEX. R. APP. P. 33.1; *see Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009). Moreover, the point of error on appeal must comport with the objection made at trial. *Lovill*, 319 S.W.3d at 691–92; *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).

---

[4] In *Griffin*, the Fifth Circuit Court of Appeals stated:

This Court has never had the opportunity to address the use of an overview witness where the witness is put on the stand to testify before there has been any evidence admitted for the witness to summarize. We unequivocally condemn this practice as a tool employed by the government to paint a picture of guilt before the evidence has been introduced. Permitting a witness to describe a complicated government program in terms that do not address witness credibility is acceptable. However, allowing that witness to give tendentious testimony is unacceptable. Allowing that kind of testimony would greatly increase the danger that a jury "might rely upon the alleged facts in the [overview] as if [those] facts had already been proved," or might use the overview "as a substitute for assessing the credibility of witnesses" that have not yet testified.

324 F.3d 330, 348 (5th Cir. 2003) (quoting *United States v. Scales*, 594 F.2d 558, 564 (5th Cir. 1979)). Given our conclusion that appellant has failed to preserve the issue, we need not and do not herein express approval or disapproval of the views espoused in *Griffin*. *See* TEX. R. APP. P. 47.1. Nevertheless, we note that appellant has cited, and we can locate, no opinion by a Texas court adopting those views.

Defense counsel objected at various times to Thompson's testimony, but none of the objections were based on the "overview" nature of the testimony, nor were they based on grounds that Thompson was testifying about facts not yet in evidence or about an "ultimate issue" in the case.[5] The issue has therefore not been preserved for our review. *See Lovill*, 319 S.W.3d at 691–92; *Pena*, 285 S.W.3d at 464. Even if the issue had been preserved, appellant has not shown that she was harmed by the admission of Thompson's testimony because, as appellant appears to concede, the testimony was merely an "overview" of evidence that was later admitted without objection. *See Griffin*, 324 F.3d at 348 (*citing United States v. Sotelo*, 97 F.3d 782, 798 (5th Cir. 1996)) ("Where objected to testimony is cumulative of other testimony that has not been objected to, the error that occurred is harmless."); *see also* TEX. R. APP. P. 44.2(b) (providing that any non-constitutional error "that does not affect substantial rights must be disregarded").

We overrule appellant's first issue.

## B. Extraneous Offenses

By her second issue, appellant contends the trial court erred in admitting, over her counsel's objection, testimony by Harrison about previous attempts appellant had made on her husband's life.

---

[5] A review of the record shows that, during direct examination and two re-direct examinations of Thompson, defense counsel objected 23 times. Sixteen of the objections were based on hearsay or confrontation grounds; the trial court overruled nine and sustained seven of those objections. Five objections were based on the prosecutor leading the witness; three of those objections were sustained and two prompted the prosecutor to rephrase or withdraw the question. The trial court also overruled one objection based on the alleged narrative form of Thompson's testimony. Finally, one objection was made on the basis that the witness was speculating; the prosecutor withdrew the question.

Harrison testified that when he drove with appellant to Sargent to familiarize himself with the area, appellant revealed the following:

> She said she had attempted to take his life by putting anti-freeze in his coffee. She had tried to take his life by over-medicating him with his own medication in his drinks. She told me at one time she put enough stuff in his drinks at night that the next morning when she got up to go to work that he was passed out in the living [room] floor and she stepped over him to go to work and then she came back and was kind of surprised that he was still alive.

Defense counsel objected to this testimony under Texas Rule of Evidence 403.[6] On appeal, appellant argues that the evidence was inadmissible under Texas Rules of Evidence 403 and 404(b). Because the objection as to Rule 404(b) was not preserved, *see* TEX. R. APP. P. 33.1(a)(1)(A), we will address only admissibility under Rule 403. We will review the trial court's decision for abuse of discretion. *Martinez*, 327 S.W.3d at 736.

Rule 403 rule states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion

---

[6] Before Harrison took the witness stand, a discussion took place outside the presence of the jury during which the prosecutor asked for the trial court's ruling on whether the testimony at issue was admissible or whether it violated a previously-granted motion in limine. In her argument, the prosecutor argued in part that "it's 404(b) evidence, it's evidence of [appellant's] state of mind, it's evidence of her intent, the seriousness of the plan, . . . absence of mistake, her knowledge about what's going to happen, pretty much all the 404(b) exceptions." *See* TEX. R. EVID. 404(b). The prosecutor also argued that the evidence was more probative than prejudicial under Rule 403. In response, defense counsel addressed only Rule 403. The trial court ruled that the evidence was admissible. Defense counsel twice renewed his objection when the testimony was eventually offered, each time specifically referencing only Rule 403.

To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). Here, although defense counsel did object to Harrison's testimony, the specific grounds for that objection did not include admissibility under Rule 404(b). *See Lovill v. State*, 319 S.W.3d 687, 691–62 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."). Moreover, defense counsel's response to the prosecutor's bench conference argument discussed only admissibility under Rule 403. Accordingly, we cannot say that appellant's trial court complaint sufficiently "stated the grounds for the ruling that the complaining party sought from the trial court." TEX. R. APP. P. 33.1(a)(1)(A).

9

of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. In *Casey v. State*, the Texas Court of Criminal Appeals stated:

> Unfair prejudice refers not to an adverse or detrimental effect of evidence but to an undue tendency to suggest a decision on an improper basis, commonly an emotional one. Unfair prejudice does not arise from the mere fact that evidence injures a party's case. Virtually all evidence that a party offers will be prejudicial to the opponent's case, or the party would not offer it. Evidence is unfairly prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justifies its admission into evidence.

215 S.W.3d 870, 883 (Tex. Crim. App. 2007) (citations omitted). Here, appellant concedes that the testimony at issue was inherently probative because the acts testified to were virtually identical to that with which appellant was charged—i.e., murdering her husband. *See Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) ("How compellingly evidence of the extraneous misconduct serves to make more or less probable a fact of consequence—in other words, its inherent probativeness—is certainly a factor [in determining admissibility under Rule 403]."). Moreover, though we are not assessing the admissibility of this testimony under Rule of Evidence 404(b), we note that the testimony was relevant beyond "prov[ing] the character of [appellant] in order to show action in conformity therewith," *see* TEX. R. EVID. 404(b), in that it tended to show appellant's motive and intent to end Jack's life.[7] Accordingly, though the evidence was prejudicial against appellant, it was not unfairly prejudicial against her.

---

[7] It is also noteworthy that the jury charge contained the following general limiting instruction:

> You are instructed that if there is any testimony before you in this case regarding the defendant having committed bad acts or offenses other than the offense alleged against her in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other bad acts or offenses, if any were committed, and even then you may only

Finally, we note that Matz later testified, without objection, about two instances when appellant sought her advice or assistance in locating someone who could kill her husband. This is arguably similar evidence to that provided by Harrison. *See Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991) (noting that error in the admission of evidence may be rendered harmless when "substantially the same evidence" is admitted elsewhere without objection). Appellant therefore has not shown that she was harmed by the admission of this testimony. *See* TEX. R. APP. P. 44.2(b).

The court of criminal appeals has noted that the permissive nature of Rule 403—providing that evidence "*may be* excluded if its probative value is substantially outweighed by the danger of unfair prejudice," TEX. R. EVID. 403 (emphasis added)—"simply means that trial courts should favor admission in close cases, in keeping with the presumption of admissibility of relevant evidence." *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991). In light of the foregoing, we cannot conclude that the trial court abused its discretion by admitting Harrison's testimony regarding appellant's remarks to him on their drive to Sargent. Appellant's second issue is overruled.

## C.     Accomplice-Witness Instruction

By her third issue, appellant contends that the trial court erred by failing to submit an instruction on accomplice-witness testimony in the jury charge. Appellant's trial counsel did not object to the charge. We will reverse a conviction based on unobjected-to jury charge error only if appellant shows "egregious harm." *Allen v. State*, 253

---

consider the same in determining the intent, motive, state of mind, preparation or plan of the defendant, if any, in connection with the offense, if any, alleged against her in the indictment in this case and for no other purpose.

11

S.W.3d 260, 264 (Tex. Crim. App. 2008) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).

Texas Code of Criminal Procedure article 38.14 provides that testimony by an accomplice must be "corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). A witness who is indicted for the same offense as the accused is an accomplice as a matter of law, and when the evidence clearly shows that a witness is an accomplice as a matter of law, the trial judge must instruct the jury accordingly. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). Here, the record clearly shows that Harrison was an accomplice as a matter of law and that he was indicted for the same offense as appellant. Therefore, the trial court erred in failing to include an accomplice-witness instruction in the jury charge. *See id.*

We must next determine if appellant suffered egregious harm because of this error. Egregious harm will be found only if the error deprived the defendant of a fair and impartial trial—that is, if it affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Ex parte Smith*, 309 S.W.3d 53, 63 (Tex. Crim. App. 2010); *Allen*, 253 S.W.3d at 264 (citing *Almanza*, 686 S.W.2d at 171). In *Herron v. State*, the court of criminal appeals stated:

> The [accomplice-witness] instruction does not say that the jury should be skeptical of accomplice witness testimony. Nor does it provide for the jury to give less weight to such testimony than to other evidence. The instruction merely informs the jury that it cannot use the accomplice witness testimony unless there is also some non-accomplice evidence connecting the defendant to the offense. Once it is determined that such non-accomplice evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the factfinder's decision-making.

12

> Therefore, non-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve.

86 S.W.3d 621, 632 (Tex. Crim. App. 2002). Additionally, under the egregious harm standard, the omission of an accomplice-witness instruction is generally harmless unless the corroborating non-accomplice evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Id.* at 633 (citing *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).

Under article 38.14, the non-accomplice evidence does not need to be sufficient in itself to establish guilt beyond a reasonable doubt, nor must it directly link the accused to the commission of the offense. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) (citing *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994); *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992)). Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration. *Id.* (citing *Munoz*, 853 S.W.2d at 559).

In this case, the non-accomplice evidence that tended to connect appellant to the offense committed includes: (1) Matz's testimony that appellant asked her if she knew anyone that could kill her husband and whether an increased dose of Jack's medication could be fatal; (2) Risinger's testimony that appellant's behavior upon discovering her dead husband was suspicious because there were "no tears, just hollering"; (3) Pierce's testimony that appellant "was not remorseful" and "had no tears in her eyes" at that time; (4) Boyd's testimony that appellant's assumption that her husband shot himself was suspicious because "[t]here was no indication that he had been shot when we got

there"; (5) evidence that appellant initially denied owning a gun even though she did own one; (6) the hotel security video showing appellant dropping off and Harrison picking up an envelope; (7) telephone records showing calls made between appellant and Harrison on May 16 and 17; (8) telephone recordings of appellant admitting that Harrison had been to her apartment to pick up money in March 2009; and (9) Story's testimony that the markings on the shell casing found at the crime scene were consistent with having been fired from appellant's gun and that the shell and bullets found at the scene were made by the same manufacturer, and were of the same brand and caliber, as ammunition found in appellant's apartment.

While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. *Dowthitt*, 931 S.W.2d at 249 (citing *Gill*, 873 S.W.2d at 49; *Cox*, 830 S.W.2d at 611). Moreover, while evidence of motive alone is insufficient to corroborate accomplice witness testimony, it may be considered along with other evidence tending to connect the defendant with the crime. *Leal v. State*, 782 S.W.2d 844, 852 (Tex. Crim. App. 1989) (en banc). Here, non-accomplice evidence of appellant's motive and intent to kill her husband and her presence in the company of Harrison was supplemented by other non-accomplice evidence tending to connect appellant to the crime and establishing appellant's suspicious behavior.

We note that, in a review for egregious harm, the corroborating evidence need not be as strong as in a review for merely "some harm." *See Herron*, 86 S.W.3d at 632

14

("The difference in harm standards impacts how strong the non-accomplice evidence must be for the error in omitting an accomplice witness instruction to be considered harmless."). Although the non-accomplice testimony in this case was not overwhelming, the law only requires that "some" corroborating evidence be adduced that tends to connect appellant to the commission of the offense. *See Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997). That standard was clearly met here. The corroborating non-accomplice evidence is not "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Herron*, 86 S.W.3d at 633. Accordingly, the error in failing to submit an accomplice-witness instruction was harmless. *See Herron*, 86 S.W.3d at 632. Appellant's third issue is overruled.

## III. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).
Delivered and filed the
12th day of July, 2012.