

## NUMBER
## 13-10-00552-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**CORDERRAL JOHN SMITH,**                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                       **Appellee.**

---

### On appeal from the 253rd District Court
### of Liberty County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Garza, Benavides and Perkes
### Memorandum Opinion by Justice Garza

A jury convicted appellant, Corderral John Smith, of capital murder, and the trial court sentenced him to life imprisonment without parole. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(3), (b) (West Supp. 2011); *id.* § 12.31(a)(2), (b)(2) (West 2011). By eight issues, appellant contends that: (1) the evidence is insufficient to corroborate the

testimony of his accomplice, Jason John Joseph Rizzi, regarding remuneration; (2) the evidence is insufficient that appellant paid or offered remuneration to Rizzi; (3) the State failed to properly qualify its DNA expert witness; (4) he received ineffective assistance of counsel (issues four and six); (5) the State failed to properly disclose the substance of its experts' testimony; (6) reversible error occurred when the alternate juror read a news report regarding the trial; and (7) the trial court failed to respond to his pre-trial request for appointment of new counsel. We affirm.[1]

## I. BACKGROUND

On August 23, 2006, officers investigating the disappearance of appellant's mother, Gloria Ryan, interviewed Rizzi, who worked with appellant at Pacesetter, a day labor company in Houston, Texas. Rizzi confessed to murdering Ryan; he claimed that appellant had offered him $5,000—later reduced to $3,000—and Ryan's van in exchange for killing her. Rizzi told the officers that on appellant's instructions, he killed Ryan at her home in Cleveland, Texas, and dumped her body in a vacant lot in Houston. Rizzi attempted to lead the officers to the location of Ryan's body, but was unable to do so. The officers arrested Rizzi and arrested appellant the following day. Using information obtained from Rizzi, police recovered Ryan's remains on August 25, 2006. Pursuant to a plea agreement, Rizzi pleaded guilty to murder and agreed to testify at appellant's trial in exchange for a sentence of forty years' imprisonment.

## II. THE EVIDENCE

The State presented the testimony of approximately twenty-five witnesses. We summarize below only the testimony relevant to the issues before us.

---

[1] This case is before the Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

## A. Jason John Joseph Rizzi

Rizzi met appellant in July or August 2006 at Pacesetter, where they were both employed.[2]  Rizzi thought appellant was in the Marine Corps because he dressed in military-style gear, including camouflage clothing, battle-dress-uniform pants, dog tags, and Marine Corps boots.  One evening, appellant, Rizzi, and another acquaintance were eating at a restaurant near Pacesetter.  Appellant said that he worked for the United States Secret Service and had a "mission" to kill his mother because she had obtained important information from the government.  Appellant offered Rizzi $5,000 and Ryan's van in exchange for killing her; Rizzi agreed to carry out the killing.  Appellant showed Rizzi a .22 rifle that he was carrying in his trunk and demonstrated how to use the weapon.  Appellant took Rizzi to his aunt's home, where Ryan was visiting, and instructed Rizzi to shoot Ryan when she came out of the house.  This attempt failed, however, when Rizzi became impatient, knocked on the door, and was told to leave.  A couple of days later, appellant told Rizzi that the opportunity to complete the "mission" was still available, but that Rizzi would receive only $3,000 and the van.  Appellant also promised Rizzi a full-time position with the Secret Service if he successfully completed the mission.

Appellant and Rizzi spent a night at the home of appellant's sister in Bellaire and also visited Rizzi's mother, Joy Rizzi, in Kingwood.  When Rizzi told Joy about the "mission," Joy became upset.  She did not believe that appellant was in the Secret Service. Despite Joy's reaction, Rizzi left with appellant.  Appellant showed Rizzi a government-type wallet and claimed to be a sheriff.  Appellant drove Rizzi to Cleveland

---

[2] In August 2006, appellant was eighteen years old and Rizzi was twenty years old.

3

and dropped him off at a park, where Rizzi spent the night outside. The next morning, appellant drove Rizzi to Ryan's house. Appellant and Rizzi went into a small shed behind the house, which appellant called his "office."[3] Inside the shed, appellant had a computer, some radio equipment, and some guns. Rizzi napped inside the office and waited for further instructions. A while later, appellant woke Rizzi up, told him Ryan had left the house, and led Rizzi into the house. Appellant described the entrance Ryan likely would use when she returned to the house. Appellant warned Rizzi that Ryan carried a handgun with her and also had a shotgun in the house. Appellant showed Rizzi where to hide inside the house and told him to use the .22 rifle to shoot Ryan five times in the head. Appellant left the house and went to his office.

Approximately an hour later, Ryan returned. Rizzi heard her enter and place her keys and handgun on a table. Rizzi stepped out and fired at Ryan, but missed. Ryan grabbed the rifle, which jammed and broke in the ensuing struggle. Ryan managed to get to her bedroom, with Rizzi attempting to hold on to her neck. Ryan retrieved the shotgun from her closet and tried to fire it at Rizzi, but the weapon did not fire because she failed to pull the hammer back. Rizzi grabbed the shotgun and shot Ryan. Because appellant had instructed him to make sure she was dead, Rizzi reloaded the shotgun and shot Ryan a second time.

Rizzi then signaled and let appellant into the house. Rizzi went through Ryan's purse to retrieve her keys to let appellant inside.[4] When appellant came in, he immediately searched Ryan's purse for money, but did not find any because Rizzi had

---

[3] Appellant had a bedroom at Ryan's home, but also frequently stayed at the home of his then-girlfriend, Melissa Hitchens.

[4] Although somewhat unclear from the record, the entrance where appellant entered was obstructed by burglar bars, which had to be opened with a key.

4

taken it.  Appellant took the money from Rizzi and also removed more money that Ryan had stored inside her Bible.  Appellant instructed Rizzi to cover Ryan's body with bed linens.  Rizzi did as instructed and pulled Ryan's body to the front door.  Meanwhile, appellant was looking through papers in Ryan's truck.  Appellant told Rizzi to use bleach to clean up the blood.  He also told Rizzi to load Ryan's body into Ryan's van; Rizzi could not do so without assistance, however, because Ryan weighed over 200 pounds. Appellant left but later returned.

Later that night, Rizzi called a friend to ask for help in moving Ryan's body, but the friend did not come.  Appellant and Rizzi drove to Pacesetter in appellant's vehicle, where they unsuccessfully asked several people for help in moving Ryan's body.  They drove back to Ryan's house, where appellant dropped Rizzi off at the unlocked house. Rizzi ate some food from the house and drank some beer.  Rizzi became angry that he was unable to load Ryan's body into the van alone.  After drinking more beer, he  shot open a safe that was in Ryan's closet.  The safe was empty except for an empty money wrapper.  Rizzi watched television and waited.  At some point, appellant came by and brought Rizzi some cigarettes.  After another day or so,[5] in the early morning, Rizzi constructed a ramp out of stacked bags of concrete mix and managed to load Ryan's body into the van.  Shortly thereafter, appellant returned to the house.  Appellant, who was driving Ryan's truck, instructed Rizzi to follow him in the van containing Ryan's body.  Rizzi followed appellant to a vacant lot in Houston.  Appellant waited at a nearby gas station and instructed Rizzi to dump Ryan's body at the vacant lot.  Rizzi asked for the money he was promised; appellant told him that he would retrieve the money and

---

[5] It is unclear how much time elapsed between Ryan's murder and the loading of her body into the van.

5

meet Rizzi at Pacesetter. Rizzi went to Pacesetter but appellant did not return with the money.

On August 23, 2006, acting on information linking Rizzi to Ryan's van, Texas Ranger Grover Franklin Huff and FBI Special Agent Rob King encountered Rizzi sitting in a park near Pacesetter. During questioning, Rizzi voluntarily confessed to Ryan's murder and described appellant's role. Rizzi attempted to lead the officers to the location of Ryan's body, but was unable to identify the location.

On cross-examination, appellant's counsel questioned whether Rizzi could have reasonably believed that he was accepting a governmental assignment when he agreed to kill Ryan. Counsel questioned Rizzi regarding why he did not attempt to verify appellant's claim to be a Secret Service agent. Rizzi testified that if had tried to withdraw from the mission, he believes that appellant would have killed him. Rizzi learned that appellant was not a Secret Service agent from Ranger Huff and Agent King.

### B. Norma Wilson

Norma Wilson is appellant's sister. She testified that after appellant had been arrested but before Ryan's body was found, she visited with appellant in jail. Wilson asked appellant "why he would do something like that," referring to Ryan's murder. Appellant responded that he and Ryan "had problems" and that Ryan had a $40,000 insurance policy. Appellant told Wilson that he let Rizzi into Ryan's house and that Rizzi called him after Ryan was dead. Wilson asked appellant why he chose Rizzi; appellant responded that Rizzi was weak-minded, did not ask questions, and stayed high all the time. On cross-examination, Wilson stated that she found an insurance

6

policy held by Ryan, but the policy had lapsed after only one month because of failure to pay the premiums. On redirect examination, Wilson testified that Ryan was the policyholder and appellant was the beneficiary on the lapsed policy.

### C. Malcolm Adams

Malcolm Adams testified that he met appellant through appellant's then-girlfriend, Melissa Hitchens. At the time of Ryan's murder, Adams was thirteen years old. Adams played video games with appellant and met Ryan on one occasion when he visited appellant. Appellant told Adams that he was a Secret Service agent, that Ryan was going to "blow his cover," and he needed to kill her. Appellant offered Adams $5,000 to kill Ryan. Adams did not take appellant's offer seriously. Later, when Adams was visiting appellant in his "office" behind Ryan's house, appellant showed Adams how to fire the .22-caliber rifle and again asked Adams to kill Ryan.

### D. John James

John James testified that he and appellant are friends and had known each other four or five years. James, who was sixteen years old in August 2006, had met Ryan on one occasion when he and appellant picked up some speakers at Ryan's house. Appellant told James that he wanted to find someone to kill Ryan because they did not get along well. Appellant offered James money in exchange for killing Ryan. James did not believe that appellant was serious.

### E. George Henderson

George Henderson testified that he had gone to school with appellant and had known him seven or eight years. Henderson was sixteen years old in August 2006. One evening around the time of Ryan's murder, appellant stopped by Henderson's

house.  Appellant told Henderson that he had killed Ryan and needed help moving the body.  Henderson did not take appellant seriously and told appellant he had other things to do.  Appellant left.  When Henderson saw appellant at a football game later, appellant told him he had moved Ryan's body and dumped it somewhere.  Henderson went to the police and provided a written statement.

## F.  Joy Rizzi

Joy Rizzi testified that in August 2006, appellant and Rizzi came by her home in Kingwood, Texas.  Joy testified that she pleaded with Rizzi not to go with appellant because what Rizzi had told her did not make sense.  She stated that Rizzi was scared; he told Joy that he would be killed.  Rizzi left with appellant.

## G.  Frank Pugh

Frank Pugh, a security guard at Pacesetter, testified that in August 2006, he noticed suspected drug activity in a van parked in the Pacesetter parking lot.  Rizzi claimed to own the van.  Pugh asked Rizzi to move the van, but Rizzi said he had lost the keys.  Pugh had the van towed by a wrecker service.

### III.  SUFFICIENCY OF CORROBORATING EVIDENCE

By his first issue, appellant contends the evidence is insufficient to corroborate Rizzi's accomplice witness testimony that appellant offered Rizzi remuneration to kill Ryan.

## A.  Standard of Review and Applicable Law

The Texas Court of Criminal Appeals recently laid out the standard of review for sufficiency of non-accomplice evidence as follows:

> [U]nder Texas Code of Criminal Procedure Article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is

8

corroborated by other, non-accomplice evidence that tends to connect the accused to the offense. Evidence that the offense was committed is insufficient to corroborate an accomplice witness's testimony. And an accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person.

. . . .

When reviewing the sufficiency of non-accomplice evidence under Article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense. The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case. The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the fact[-]finder's resolution of the evidence. Therefore, it is not appropriate for appellate courts to independently construe the non-accomplice evidence.

*Smith v. State*, 332 S.W.3d 425, 439, 442 (Tex. Crim. App. 2011) (internal citations omitted); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984). Evidence that the defendant was in the company of the accomplice near the time or place of the offense is also proper corroborating evidence. *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997). Evidence of motive alone is not sufficient to corroborate accomplice witness testimony, but may be considered along with other evidence tending to connect the defendant with the crime. *Leal v. State*, 782 S.W.2d 844, 852 (Tex. Crim. App. 1989) (en banc). If the combined weight of the non-accomplice

9

evidence tends to connect the defendant to the offense, then the requirement of article 38.14 has been fulfilled. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999).

A person commits capital murder if, among other possibilities, he intentionally commits murder by employing another person "to commit the murder for . . . the promise of remuneration." TEX. PENAL CODE ANN. § 19.03(a)(3) (West Supp. 2011). Murder is properly defined as "intentionally or knowingly caus[ing] the death of an individual," or "intend[ing] to cause serious bodily injury and commit[ing] an act clearly dangerous to human life that causes the death of an individual." *Id.* § 19.02 (b)(1)–(2) (West 2011). Remuneration occurs when an "actor kills a victim in order to receive a benefit or financial settlement paid upon the death of the victim." *Beets v. State*, 767 S.W.2d 711, 737 (Tex. Crim. App. 1987); *see also Rice v. State*, 805 S.W.2d 432, 434 (Tex. Crim. App. 1991) (en banc). Remuneration "does not require the narrow construction requiring payment by a principal to an agent," but is "given a broad definition[,] which . . . includes the idea of a reward given or received because of some act." *Rice*, 805 S.W.2d at 434.

### B. Discussion

Appellant argues that there is insufficient corroborating evidence to establish that he offered remuneration to Rizzi. Appellant argues there is no written agreement, videotape, or other physical evidence of an agreement between himself and Rizzi. He also argues there is no evidence that he gave the van to Rizzi or that he knew Rizzi had possession of the van.

Disregarding Rizzi's testimony and examining the remaining record for evidence, we conclude the State presented sufficient evidence tending to connect appellant to

10

Ryan's murder and the offer of remuneration. Wilson testified that appellant told her he let Rizzi into Ryan's house and Rizzi called him after Ryan was dead. Wilson also testified that appellant was the named beneficiary on a lapsed $40,000 insurance policy held by Ryan, and that when she questioned appellant about Ryan's death, he mentioned the $40,000 policy. *See Leal*, 782 S.W.2d at 852. Adams testified that appellant offered him $5,000 to kill Ryan and on a second occasion at Ryan's house, asked Adams to kill Ryan. James testified that appellant told him that he wanted to find someone to kill Ryan and offered James money to kill her. Henderson testified that appellant asked him for help in moving Ryan's body. Joy Rizzi testified that appellant and Rizzi came to her house. Although Joy did not testify regarding what Rizzi said to her because of a hearsay objection, she told him it did not make sense; Rizzi was scared and left with appellant. We conclude that this evidence tends to connect appellant to Ryan's murder and sufficiently corroborates Rizzi's testimony that appellant offered him remuneration to kill Ryan. We overrule appellant's first issue.

## IV. LEGAL SUFFICIENCY

By his second issue, appellant appears to argue that the evidence is insufficient that he either offered or paid remuneration to Rizzi. Specifically, appellant argues that the evidence is insufficient to establish that Rizzi murdered Ryan for remuneration because Rizzi testified that he did not kill Ryan for the money or the van, but for his "country." Appellant also argues that there is no evidence that appellant had $5,000 or $3,000 to pay Rizzi and no evidence that appellant transferred the title of the van to Rizzi.

### A. Standard of Review and Applicable Law

11

The court of criminal appeals has held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902–03, 912 (Tex. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Accordingly, we review claims of evidentiary insufficiency under "a rigorous and proper application of the *Jackson* standard of review." *Id.* at 906–07, 912. Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Brooks*, 323 S.W.3d at 898–99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt"). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Id.* (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)). We must resolve any inconsistencies in the testimony in favor of the verdict. *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

In reviewing the legal sufficiency of the evidence, we look at events occurring before, during, and after the commission of the offense, and we may rely on actions of the appellant that show an understanding and common design to do the prohibited act. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).  Each fact need not point directly and independently to the appellant's guilt, so long as the cumulative effect of all the incriminating facts is sufficient to support the conviction.  *Id.*

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge.  *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."  *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

Here, the indictment alleged that appellant (1) intentionally or knowingly (2) caused Ryan's death (3) by employing Rizzi to murder her (4) for remuneration or the promise of remuneration, to wit, currency and a motor vehicle, and (5) that Rizzi killed Ryan by shooting her with a firearm.

**B. Discussion**

Appellant specifically challenges the sufficiency of the evidence regarding the remuneration element.  As noted above, remuneration "does not require the narrow construction requiring payment by a principal to an agent," but is "given a broad definition[,] which . . . includes the idea of a reward given or received because of some

13

act." *Rice*, 805 S.W.2d at 434.

Rizzi testified that appellant offered him $5,000—later reduced to $3,000—and Ryan's van in exchange for killing Ryan, and that he carried out the murder. Eliminating from consideration Rizzi's testimony, the non-accomplice evidence showed that: (1) prior to enlisting Rizzi, appellant told two other friends, Adams and James, that he wanted to find someone to kill Ryan and offered money to each of them to kill her; (2) appellant believed he was the beneficiary on a $40,000 life insurance policy held by Ryan; and (3) after Ryan's murder, Rizzi was in possession of Ryan's van and told Pugh that the van was his. Although appellant points to Rizzi's testimony that he murdered Ryan for his "country" rather than for money, we note that Rizzi, who was homeless during the week, testified that he wanted to "get off the street" and planned to use the money that appellant promised him to buy clothes, a "grill"—which he described as a metal mouthpiece—and an apartment. The jury was entitled to judge the weight to be given Rizzi's testimony and to reconcile any conflicts in his testimony regarding his reasons for agreeing to kill Ryan. *See Anderson*, 322 S.W.3d at 405. We conclude that the evidence set out above served as a sufficient basis for the jury's determination that appellant employed Rizzi to kill Ryan for remuneration or the promise of remuneration, and that Rizzi caused Ryan's death while acting pursuant to that agreement. We overrule appellant's second issue.

## V. Qualification of State's DNA Expert

By his third issue, appellant argues that the State did not properly qualify Monte Wayne Miller, Ph.D., as its DNA expert witness. The State responds, among other things, that appellant has not preserved any error. We agree.

14

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard, and may not reverse the judgment if the trial court's decision is within the zone of reasonable disagreement. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). To preserve a complaint for appellate review, the record must show that a specific and timely complaint was made to the trial judge and that the trial judge ruled on the complaint. *See* TEX. R. APP. P. 33.1; *Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009).

We have reviewed Dr. Miller's testimony. Appellant did not object to the testimony on any basis, and therefore, did not preserve any issue for our review. *See* TEX. R. APP. P 33.1; *Lovill*, 319 S.W.3d at 691. We overrule appellant's third issue.

## VI. INEFFECTIVE ASSISTANCE

By his fourth issue, appellant contends his trial counsel was ineffective by failing to (1) sufficiently communicate with him prior to trial, (2) adequately investigate his case, (3) prepare a reasonable defense, (4) produce a potentially favorable witness, (5) produce any witnesses, and (5) provide an alternative theory of the case. By his sixth issue, appellant contends that his trial counsel was ineffective because he failed to adequately explain the State's pre-trial plea offer of "a plea of guilty with a cap of sixty (60)."

Ineffective assistance of counsel claims are evaluated under the two-part test articulated by the United States Supreme Court in *Strickland v. Washington*. *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). The *Strickland* test requires the appellant to show that counsel's

15

performance was deficient, or in other words, that counsel's assistance fell below an objective standard of reasonableness. *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 687. Assuming appellant has demonstrated deficient assistance, he must then show that there is a reasonable probability that, but for counsel's errors, the result would have been different. *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 694. In determining the validity of appellant's claim of ineffective assistance of counsel, "any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Thompson*, 9 S.W.3d at 813.

The State asserts that appellant has waived any ineffective assistance claim because the issue is inadequately briefed. We agree.

It is insufficient that an appellant raise only a general constitutional doctrine in support of his request for relief. *See Bell v. State*, 90 S.W.3d 301, 305 (Tex. Crim. App. 2002). An appellant must cite specific legal authority and provide legal arguments based on that authority. *Id.*; *see* TEX. R. APP. P. 38.1(i). Here, appellant merely recites the general constitutional doctrine regarding effective assistance of counsel and asserts that his counsel failed to develop a theory or alternative to the State's theory of the case. He cites nothing in the record to support his assertions. He has not identified, nor does the record reflect, any potential witness that his counsel failed to provide. He provides no legal analysis to support any argument as to how he was prejudiced by his counsel's alleged failures. Appellant's conclusory argument lacks any supporting authority or legal analysis, is inadequately briefed, and thus presents nothing for our appellate review. *See* TEX. R. APP. P. 38.1(i); *Bell*, 90 S.W.3d at 305; *see also Moreno Denoso v. State*, 156 S.W.3d 166, 184 (Tex. App.—Corpus Christi 2005, pet. ref'd)

16

(holding ineffective assistance claim waived where appellant failed to cite authority or posit arguments to establish the *Strickland* elements of ineffective assistance).

Moreover, appellant does not address at all the second prong of *Strickland*: whether there is a reasonable probability that, but for trial counsel's alleged errors, the result would have been different. *Thompson*, 9 S.W.3d at 812; *see Strickland*, 466 U.S. at 694. Therefore, appellant has not met his burden to prove ineffective assistance of counsel by a preponderance of the evidence. *See Thompson*, 9 S.W.3d at 813. We overrule appellant's fourth issue.

By his sixth issue, appellant contends counsel was ineffective by failing to adequately explain the State's pre-trial plea offer. Appellant acknowledges that trial counsel informed him of the plea offer, but argues that because "he did not have a clear understanding of the offer, his counsel was ineffective in representing him." In his brief, appellant's counsel on appeal asserts that appellant's trial counsel claims that he explained the plea offer to appellant, "although not to his satisfaction."

As with appellant's other claims of ineffective assistance, this issue is inadequately briefed. Appellant has provided no citations to authorities or the record and no legal analysis. *See* TEX. R. APP. P. 38.1(i); *Bell*, 90 S.W.3d at 305; *Denoso*, 156 S.W.3d at 184. Accordingly, no issue is preserved for our review.[6]

---

[6] We note that the United States Supreme Court recently held that the Sixth Amendment right to effective assistance of counsel extends to the consideration of plea offers that lapse or are rejected. *See Missouri v. Frye*, No. 10-444, 2012 U.S. LEXIS 2321, at *20–23 (U.S. March 21, 2012); *see also Lafler v. Cooper*, No. 10-209, 2012 U.S. LEXIS 2322, at *21–22 (U.S. March 21, 2012) ("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it. If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence."). Nonetheless, a claim of ineffective assistance is waived if, as here, it is inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

## VII. FAILURE TO DISCLOSE EXPERT TESTIMONY

In the "Issues Presented" section of his brief, appellant lists his fifth issue as: "Whether the State Properly and Correctly Disclosed What Its Experts Would Testify to During the Trial on the Merits?" However, the "Argument" section of appellant's brief simply restates the question; no argument, discussion, or analysis follows. Accordingly, the issue is waived as inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

## VIII. ALLEGED JUROR MISCONDUCT

By his seventh issue, appellant argues that reversible error occurred when during the first day of trial, the alternate juror read a news "radiogram"[7] related to the case. The record reflects that after being advised that the alternate juror was exposed to the radiogram, the trial court read the brief contents of the news report into the record. Appellant's trial counsel agreed with the trial court that the report contained only "public information." Appellant's counsel made no objection. He requested that the trial court advise the jury not to read any news articles about the case, and the trial court so instructed the jury. Counsel did not object to the trial court's instruction. Accordingly, no issue is preserved for review. *See* TEX. R. APP. P. 33.1. We overrule appellant's seventh issue.

## IX. APPELLANT'S REQUEST FOR CHANGE OF COUNSEL

By his eighth issue, appellant contends the trial court erred by failing to respond to his pre-trial requests for new counsel. Appellant asserts that he wrote several letters to the trial court prior to trial complaining that his counsel had not contacted him. Again,

---

[7] Apparently, the report was a printed version of information contained in a radio broadcast.

appellant has provided no citation to authorities or to the record and no legal analysis.[8]

Accordingly, no issue is preserved for appeal. *See* TEX. R. APP. P. 38.1(i). Moreover, "[a] trial court has no duty to search for counsel agreeable to a defendant." *Maes v. State*, 275 S.W.3d 68, 71 (Tex. App.—San Antonio 2008, no pet.) (citing *King v. State*, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000)). We overrule appellant's eighth issue.

## X. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
12th day of April, 2012.

---

[8] We note that although appellant failed to provide proper citation to the record, we have reviewed various letters from appellant to the trial court contained in the supplemental clerk's record.