Opinion issued April 25, 2024



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-22-00492-CR**
_____

**FLORIBETH SANDOVAL BENJUME, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 461st District Court**
**Brazoria County, Texas**
**Trial Court Case No. 92061-CR**

---

**MEMORANDUM OPINION**

A jury found Floribeth Sandoval Benjume guilty of manslaughter, an offense for which she was indicted after the vehicle she was driving fatally collided at an intersection with Bruce Watson, a sergeant with the Harris County Sheriff's Office

who was operating a motorcycle. The jury assessed her punishment at two years of incarceration. Sandoval appeals from her judgment of conviction, arguing that:

(1) a new trial is required because digital or electronic exhibits admitted into evidence at trial are missing, inaccessible, or unidentifiable on appeal;

(2) her conviction must be reversed because the evidence is legally insufficient to prove she grossly deviated from the standard of care that an ordinary person would have exercised under the circumstances;

(3) a new trial is required due to the trial court's error in denying her request to appoint an interpreter to translate recordings from Spanish into English;

(4) a new trial is required due to the trial court's error in denying her request to admit a written translation of one of the aforementioned recordings; and

(5) a new trial is required due to the trial court's error in excluding evidence from expert witnesses regarding the issue of concurrent causation.

We affirm the trial court's judgment.

## BACKGROUND

A grand jury indicted Sandoval for manslaughter, alleging she recklessly caused the death of Watson while driving a motor vehicle and colliding with Watson's motorcycle. The indictment alleged Sandoval was reckless in four ways: by entering an intersection in disregard of a red traffic signal, going around other vehicles that stopped at the red traffic signal, entering the intersection from the left-turn lane and failing to turn left, and failing to keep a proper lookout.

Sandoval pleaded not guilty, and the case was then tried to a jury.

The State's first witness was Jacob Garcia Perez, a licensed security contractor who owns and operates Southern Technologies Unlimited, a company specializing

2

in surveillance cameras and monitored security. His company installed two cameras near the intersection where the collision occurred that recorded the event. At its request, Perez gave these recordings to the Pearland Police Department.

The surveillance footage from both cameras was played for the jury. The footage shows the intersection of Kingsley Drive and Shadow Creek Parkway. On both of these roadways, a median separates traffic traveling in opposite directions. Prior to the collision, Sandoval was traveling northbound on Kingsley Drive, which at the intersection has three lanes: a left-turn lane, middle lane, and right lane.

One of the surveillance cameras provided a clear view of the traffic signal governing the flow of traffic traveling northbound on Kingsley Road. This traffic signal remained red continuously for several minutes before the collision. During this time, the left-turn signal cycled through more than once, allowing some northbound traffic to turn west onto Shadow Creek Parkway. Due to the red northbound signal, however, traffic began to accumulate on Kingsley Drive.

Sandoval, who was behind the wheel of a Cadillac Escalade, was one of the motorists who became stopped at the intersection. Initially, she pulled up behind some other vehicles in the middle northbound lane of Kingsley Road. After several minutes elapsed, Sandoval steered into the left-turn lane, which had since emptied. Like the traffic signal for northbound traffic, the left-turn signal was red at this time. Nonetheless, Sandoval proceeded into the intersection. But she did not turn left,

despite being in the left-turn lane. Instead, she steered her Escalade to the right and drove northbound through the intersection from the left-turn lane. Before Sandoval had completely cleared the intersection, Watson traveling westbound on Shadow Creek Parkway collided with her Escalade, which then crashed into the median.

Earlier footage shows that the signal for northbound traffic on Kingsley Drive cycled infrequently, remaining red for relatively lengthy periods of time. This earlier footage also shows that several motorists traveling northbound on Kingsley Drive responded to the delay by driving through the intersection against the red signal when motorists traveling east and west on Shadow Creek Parkway were stopped. None of these other motorists, however, proceeded northbound through the intersection from Kingsley Drive's left-turn lane the way that Sandoval later did.

The State's next witness was Dr. Merrill Hines, a forensic pathologist employed by the Harris County Institute of Forensic Sciences. Hines conducted an autopsy on Watson and concluded that he died as a result of an accident, determining that Watson's cause of death was multiple blunt force injuries he sustained. Based on the combination of injuries Watson sustained, Hines opined that it was not possible to save his life through any kind of medical intervention. Hines also opined that classification of the cause of death as an accident was for statistical purposes, not a legal determination about anyone's criminal responsibility, if any.

The State next called Michael Miller to the stand. Miller saw the collision.

Miller previously served for over three decades as a peace officer with the Harris County Sheriff's Office, retiring at the rank of lieutenant. Immediately before the collision, Miller was traveling westbound on Shadow Creek Parkway behind Watson. Miller had not yet reached the Kingsley Drive intersection, but he was not far from it, estimating that it was no more than 75 to 100 yards distant. He had an unobstructed view of the intersection, Watson on his motorcycle ahead of him, and the westbound Shadow Creek Parkway traffic signal, which had changed to green.

Miller testified that Sandoval's Escalade came "out of nowhere" and Watson on his cycle then "crashed into the [Escalade] as it entered into the intersection."

The State's next witness was Zaricka Prater, a business analyst with the Houston Independent School District, who also saw the collision. She was traveling northbound on Kingsley Drive and was stopped at the intersection with Shadow Creek Parkway due to the red traffic signal when the collision occurred. Her vehicle was fourth in line in the middle lane, right behind Sandoval's Escalade. Prater testified that the driver of the Escalade, Sandoval, eventually changed lanes into the left-turn lane. But instead of turning left, Sandoval veered right "to get in front of all the cars that were at the light waiting" and went straight through the intersection. Prater then saw the motorcycle cop, Watson, collide with the Escalade. Like Miller, Prater testified that the traffic signal governing westbound traffic on Shadow Creek Parkway, and thus Watson's movement, was green at the time of the accident.

5

On cross-examination, defense counsel asked Prater to confirm that she could not say one way or another what Sandoval herself saw before the collision. But Prater refused, testifying that Sandoval had to have seen Watson approaching the intersection on his motorcycle because Prater and everyone else could see him.

Dr. Eugene Stautberg, an orthopedic surgeon, was then called by the State. He too was an eyewitness to the collision. At the time, he was traveling southbound on Kingsley Drive and was slowing to stop near the intersection with Shadow Creek Parkway because the traffic signal there was red. As Stautberg was slowing to a stop, he saw Sandoval's Escalade "pull out into the intersection" traveling in the opposite direction as him—northbound on Kingsley Drive. He then heard a "very loud impact" and briefly saw the motorcycle cop, Watson, "above the SUV in the air."

Being a doctor, Stautberg rendered aid to Watson after the collision. Stautberg checked for a pulse, and detected what he described as "a thready pulse," which means "there's [a] little pulse there, but it's not very strong at all." He tried to communicate with Watson to no avail, and Watson's pulse became weaker. Watson was lying face down, so Stautberg and others at the scene turned him over. Watson remained nonresponsive and they could no longer detect a pulse, so a nurse at the scene began to provide CPR. Once she tired, Stautberg took over providing CPR. Shortly afterward, paramedics arrived and took over Watson's medical care.

Next, the State called Robert Upton, a civil engineer employed as the Director of Engineering and Public Works for the City of Pearland. He oversees services relating to the operation, maintenance, and repair of traffic signals in Pearland. After the collision, the equipment relating to the traffic signals at the intersection of Kingsley Drive and Shadow Creek Parkway was inspected. Upton also reviewed the video surveillance footage of the collision. Based on his review, he concluded that the traffic signal in question "was working." He testified that there were some misdetections in which equipment did not detect traffic and thus did not prompt the signal to turn green on a given cycle but did eventually detect traffic resulting in a green signal. In addition, Upton noted that during this period the left-turn arrow continued to cycle. Under these circumstances, in which the traffic signal continued to cycle and detect traffic, Upton testified that the signal functioned as intended.

On cross-examination, defense counsel questioned Upton about two conflict log entries as to the traffic signal in question from the morning before the collision. Upton testified that they reflected a two-second interruption in power to the traffic signal. He further testified that this was of no significance. Indeed, Upton stated that it was so brief that it may not have affected the traffic signal's functionality at all.

Watson's widow took the stand next. She briefly testified regarding how she learned about the collision as well as her late husband's duties as a peace officer.

Jeffrey Rando then testified for the State. Rando, a project manager at the University of Texas, witnessed the collision. At the time, he and his wife were traveling northbound in the middle lane on Kingsley Drive. They were stopped about four to six cars back from the intersection of that road and Shadow Creek Parkway. Rando saw Sandoval's Escalade steer into the left-turn lane from the middle one. Afterward, the Escalade "pulled up to the light, and a second or two later it pulled into the intersection." Instead of turning, the Escalade "pulled back to the right in front of the line of cars in front of [Rando and his wife]." Rando then momentarily lost sight of the Escalade, after which he heard "a loud impact and saw the SUV jerk in a very unusual way. Not changing lanes, but a very sharp jerk to the left." Rando then saw the Escalade travel up and onto the median, hitting a pole that is on it. He had previously seen Watson on his motorcycle traveling westbound on Shadow Creek Parkway, but Rando could no longer see Watson after he heard the collision. The vehicles immediately in front of him obstructed his view. His wife dialed 911.

The next witness was B. Rusk, a peace officer employed by the Pearland Police Department who held the rank of sergeant when the collision happened. At the time, Rusk was a patrol supervisor, and he was out on patrol when a motorist flagged him down a couple of blocks from the intersection of Kingsley Drive and Shadow Creek Parkway and informed him of the collision. Rusk then immediately went to the scene of the collision, and he was the first peace officer to arrive there.

8

Rusk testified that he first saw the "crashed motorcycle" and "a downed rider" whom he did not know but who was wearing a Harris County Sheriff's Office uniform. As the downed rider, Watson, had a "very sporadic and very faint" pulse, Rusk requested medics. Bystanders, including a couple of medical professionals, were also present, and these medical professionals thought it would be best to begin CPR immediately. The medical professionals performed CPR until EMS arrived.

Rusk was wearing a body camera, and part of its footage was played for the jury. Among other things, the footage, which is accompanied by audio, shows the scene in the immediate aftermath of the collision and captures the efforts that Rusk and medical professionals at the scene made to administer medical care to Watson.

Once EMS had removed Watson from the scene by ambulance, Rusk requested that officers trained in accident reconstruction be dispatched. More patrolmen had arrived, and Rusk had them interview witnesses. Meanwhile, Rusk contacted the Harris County Sherriff's Office to identify the motorcycle cop.

After Rusk testified, the State called C. Giron, a peace officer with the Pearland Police Department. When the collision took place, Giron was at another accident scene. Dispatch informed him of the serious collision between Sandoval and Watson, and Giron went to scene. When he arrived, Rusk was already there.

Upon arrival, Giron saw many bystanders, the motorcycle, debris from the collision, and Watson lying on the ground. Giron put Life Flight on standby.

9

After EMS arrived, Giron began investigating. He determined that Sandoval's Escalade was the other vehicle involved in the collision and interviewed witnesses.

Like Rusk, Giron was wearing a body camera, and a portion of its footage was played for the jury. The initial footage, which does not have audio, shows Giron, at the previous accident scene and in route to the scene of the collision. Once he arrived at the collision scene, the footage, now accompanied by audio, shows events there. Among other things, the footage captured Giron's interview of an eyewitness.

The eyewitness, Anthony Cooper, was a motorist who, like Watson, was traveling westward on Shadow Creek Parkway. Watson originally had been behind Cooper, but Watson then changed lanes to the right and sped past Cooper. Cooper stated that as he and Watson approached the intersection with Kingsley Drive, they had a green traffic signal at the time, and that Sandoval's "Escalade ran the light" for northbound traffic on Kingsley Drive. Cooper saw the resulting collision.

Giron suspected that a crime may have been committed. He did not speak with Sandoval at the scene or at the hospital afterward, where she was questioned by another, but Giron did eventually assist in arresting her about a month later.

The State called R. Guajardo to the stand next. At the time of trial, Guajardo was a detective with the Pearland Police Department, but he was a patrol officer at the time of the collision. When informed of the collision, he went to the scene.

When Guajardo arrived, EMS was performing CPR on Watson. So he began trying to secure the scene, ascertain who was involved in the collision, and identify witnesses. In particular, he interviewed Prater and Sandoval at the collision scene.

According to Guajardo, Sandoval preferred to speak in Spanish. He testified that accommodating her preference was easy, as Spanish is his "first language."

Guajardo wore a body camera, which recorded his interview of Sandoval, and portions of its footage were played for the jury, including this interview. As it was played for the jury, Guajardo summarized and translated it into English. When Guajardo began to do so, defense counsel objected on two grounds. First, counsel objected that Guajardo's translation was "inaccurate" and did not reflect "what was actually said." Second, counsel objected that Guajardo was "not a court-certified translator" and asked the trial court "to have a certified court interpreter translate the Spanish to English." The trial court overruled these objections but granted defense counsel a running objection as to Guajardo's translation of Sandoval's statements.

According to Guajardo's translation, Sandoval told him that "she made a left turn and was hit" by Watson. Guajardo testified that Sandoval told him she did not know what had happened but that someone hit her while she was turning left. Guajardo said that her explanation did not make sense, given the location of the collision deep into the intersection, so he tried to clarify what she was saying. But Sandoval continued to tell him that she was making a left turn when the collision

11

occurred. Guajardo stated that Sandoval remained consistent on this point during the interview, even though he repeatedly asked her to confirm this particular detail.

Sandoval subsequently went to the hospital, and Guajardo was assigned to accompany a detective to the hospital to conduct a further interview of Sandoval. Like the previous interview, this one was recorded by Guajardo's body camera, and Guajardo again spoke with Sandoval in Spanish, interpreting for the detective. When the State sought to introduce this body camera footage into evidence with Guajardo summarizing and translating it, in part, for the jury, defense counsel urged the same objections, which the trial court overruled. But the trial court again granted defense counsel a running objection as to Guajardo's translation of Sandoval's statements.

During the hospital interview, Sandoval stated that she did not know what happened but that the motorcycle struck the Escalade on the passenger side. At one point Sandoval seemed to acknowledge that she was traveling straight through the intersection at the time of the collision, but then stated she was trying to turn left. Because Sandoval's explanation was not clear, Guajardo gave her a picture of the intersection and asked her to draw her route on it. Sandoval did so, indicating that she had been trying to turn left and veered to the right only after the collision. The drawing made by Sandoval showing her route was admitted into evidence.

Sandoval also stated either that the traffic light was green or that she had a green arrow to turn during the hospital interview. But by this time, the Pearland

12

Police Department had access to the surveillance camera footage that recorded the collision at the intersection, and Guajardo showed the video to Sandoval on a phone. The video was inconsistent with Sandoval's claims about the traffic signals.

On cross-examination, Guajardo agreed that he had not taken an oath as an interpreter and was not licensed as an interpreter by the judicial branch or otherwise. But he had taken and passed a departmental Spanish-language proficiency test.

Defense counsel questioned Guajardo at length about his interviews of Sandoval, often asking him to translate them into English statement by statement. But the defense also requested that the trial court admit into evidence affidavits made by translators who translated Guajardo's interviews with Sandoval into English. The trial court ultimately refused to allow these affidavits and translations into evidence.

The State then called C. O'Neil as a witness. O'Neil is a detective with the Pearland Police Department who was assigned to investigate the collision.

O'Neil is trained in "crash reconstruction." In addition to his training on the subject, he had performed about 24 crash reconstructions by the time of trial.

O'Neil testified that his investigation showed Watson was traveling 64 miles per hour on Shadow Creek Parkway and had slowed to 51 miles per hour by the time of the collision. He calculated the former figure based on the time it took Watson to travel a particular distance between two points, as shown in the surveillance footage.

O'Neil based the latter figure on the motorcycle's speedometer, which stopped functioning on impact and continued to read 51 miles per hour after the collision.

The speed limit on Shadow Creek Parkway is 50 miles per hour, and O'Neil agreed that Watson was not responding to an emergency or another type of call in his role as a peace officer that might have justified his speed. But O'Neil opined that the collision would have occurred even if Watson had been observing the speed limit. According to O'Neil, his investigation showed that the cause of the collision was Sandoval's disregard of the red traffic signal and lane markings. He concluded that if she had not run the red light, then the collision would not have happened.

It was clear, dry, and sunny the day of the collision. Based on his investigation, O'Neil testified that from Sandoval's position in the intersection, she would have been able to see a little under half of a mile down Shadow Creek Parkway.

Finally, the State called D. Calhoun, a sergeant with the Harris County Sheriff's Office. He is an instructor on motorcycles and teaches the basic motorcycle operator's course for the Sheriff's Office. On the day of the collision, he and Watson acted as a funeral escort. Afterward, they went their separate ways. Calhoun was subsequently notified about the collision, and he went to the scene afterward.

Calhoun testified that at speeds of 50 miles per hour or more, there is no evasive maneuver that a motorcyclist can safely execute to avoid a collision. He explained that because motorcycles have just two tires in contact with the road, an

14

evasive maneuver at such speeds could result in loss of control of the motorcycle. Calhoun opined that the only thing a cyclist can do at these speeds is apply the brake, if it is possible to do so under the circumstances. But he also testified that braking at a high speed poses its own risk: the brakes can lock and cause the cycle to skid.

The State rested, and the defense then began calling its witnesses.

The first witness for the defense was James Davis, an expert on motorcycle safety and dynamics. Davis opined that Watson could have avoided the collision had he braked in time. According to Davis, the surveillance footage showed evidence of modest braking at most. Davis disagreed that Watson had slowed down to 51 miles per hour immediately before the collision. Davis also opined that Watson was speeding and that he could have avoided the collision if he had not been speeding.

In addition, Davis testified that Watson did not maneuver in an effort to avoid the collision. Based on a zoomed-in version of the surveillance footage (that the trial court declined to admit into evidence based on the State's objections), Davis testified that Watson had been looking down shortly before the collision occurred.

Next, the defense called Paulino Serrano. He testified that on the day of the collision, he observed the traffic signal at the intersection at issue was not cycling. Serrano said the signal governing northbound traffic on Kingsley Drive "wouldn't turn green" often and did not remain green for long when the signal did do so. Serrano, however, did not witness the collision between Sandoval and Watson.

15

Robert Saylor then took the stand. He is a research engineer for the Texas A&M Transportation Institute, or, in layman's terms, a traffic signal engineer.

Saylor testified that the traffic signal for northbound traffic on Kingsley Drive "was not operating in a way that would be consistent with good timing practices" on the day of the collision, in that it was not properly cycling through to a green light. He explained, based on the surveillance footage, "that there were phases that had vehicles waiting to be served that were not served in certain cycles," an indication that "there was something wrong." In other words, Saylor opined that the traffic signal often left vehicles waiting for a green light that never came but should have. During the ten cycles captured by the surveillance footage admitted into evidence, the northbound direction should have been served green ten times," but "it was only served green three times out of those ten." The green was "skipped seven times." As a result, the northbound signal remained red for eight minutes and three seconds immediately before the collision because the signal was not cycling to green. According to Saylor, the most likely cause of this malfunction was a hardware failure, though he conceded that it was possible a camera was not detecting vehicles.

On cross-examination, Saylor agreed that a motorist confronted with a red traffic signal must remain in place and that no law exists that would allow a motorist to do otherwise. He added that motorists do not expect a light to remain red for more than eight minutes, and they will "do something" out of frustration if the traffic

16

signal is not cycling properly to allow them to proceed at regular intervals. But Saylor agreed that disobeying traffic signals can create very dangerous situations.

Next, the defense called Jason Staton, a detective assigned to the Pearland Police Department's crime scene unit. His job responsibilities include the processing and storing of evidence. In this case, Staton extracted data from both Sandoval's and Watson's cell phones. During his testimony, the defense introduced Watson's cell phone into evidence. Based on his examination of the cell phone, Staton testified that he could not see any data that he "determined to be relevant to this case."

Mike Andrews, who has a doctorate in physics and is employed as a forensic physicist specializing in traffic accident investigation and reconstruction, then testified for the defense as an expert witness. He analyzed the collision.

Using the same basic technique that O'Neil had, Andrews calculated that Watson's speed as he approached the intersection was almost 70 miles per hour, rather than 64 miles per hour. The difference was in part attributable to the use of slightly different measurements of distance than O'Neil used as well as the use of an electronic timing mechanism in lieu of the stopwatch method used by O'Neil. Based on the Escalade's electronic data recorder's data on the force of the impact, Andrews calculated that Watson was traveling 60 miles per hour at the time of the collision, as opposed to O'Neil's figure of 51 miles per hour. Unlike O'Neil, Andrews did not

think one could rely on the fact that the speedometer still read 51 miles per hour after the collision as an accurate indicator of Watson's speed when he hit Sandoval.

On cross-examination, the prosecution asked whether Watson would have died had Sandoval not proceeded into the intersection when she did. Andrews replied that he did not see how Watson could have died absent Sandoval's presence there. But Andrews also noted that the collision would not have occurred if Watson had been traveling at a lower speed, even one that was still in excess of the speed limit, like 60 miles per hour, because Watson would have been able to brake more effectively and Sandoval would also have had more time to exit the intersection. Ultimately, he thought both Watson and Sandoval together caused the collision.

The defense then called John Laughlin, a biomechanical engineer and human factors expert. He made an analysis identifying factors contributing to the collision.

Laughlin testified that at the time of the collision it was sunny and midday, so there were "no real sight obstacles." Both Sandoval and Watson had a clear view. Nonetheless, Laughlin thought Watson would have been less visible or recognizable due to the size, shape, and coloration of his motorcycle as well as his clothing.

Further, Watson was being followed by an SUV. According to Laughlin, a motorist could become fixated on this more distant but larger, more visible vehicle.

Laughlin also opined that the traffic signal contributed to the collision. He testified that "without the traffic light being broken," northbound traffic on Kingsley Drive would have had the opportunity to safely move through the intersection.

In addition, Laughlin testified that Watson's excessive speed contributed to the collision. In essence, he testified that cross-traffic's expectations in terms of the risk posed by the intersection would be based on the speed limit set by the law.

Finally, the defense recalled Perez, who had been the State's first witness, to the stand. Perez testified about some of the specific features of the surveillance footage, such as an encrypted digital watermark that ensures footage is unaltered.

The jury found Sandoval guilty. After hearing additional evidence relevant to punishment, the jury assessed her punishment at two years of incarceration. The trial court entered a judgment in conformity with the jury's verdict and punishment.

Sandoval appeals.

## DISCUSSION

### I.    Appellate Record

Sandoval contends the record is incomplete or otherwise inadequate in three ways. First, she asserts the clerk of this court does not possess all the video exhibits that were introduced into evidence at trial. Second, she contends one of the video exhibits the clerk does have is unplayable. Third, Sandoval contends none of the video exhibits on file are properly labeled so as to be identifiable.

19

Based on our review of the reporter's record, the following video exhibits, which are in digital or electronic format, were admitted into evidence at trial:

- State's Exhibit 1, which consists of surveillance footage from two different angles that recorded the intersection, including the collision;

- State's Exhibit 14, which consists of approximately eight minutes of footage from Sergeant Rusk's body camera;

- State's Exhibit 15, which consists of approximately ten minutes of footage from Officer Giron's body camera;

- State's Exhibit 16, which consists of footage from Officer Guajardo's body camera, including his interview of Sandoval at the collision scene;

- State's Exhibit 17, which consists of footage from Officer Guajardo's body camera recording his later interview of Sandoval at the hospital; and

- Defendant's Exhibit 6, which consists of the entirety of the footage from Sergeant Rusk's body camera at the collision scene.

Of these exhibits, State's Exhibits 16 and 17 are recordings of interviews conducted in Spanish, and Guajardo translated relevant portions into English at trial. Though admitted into evidence, Defendant's Exhibit 6 was not published to the jury.

As to Sandoval's contention about missing and unplayable exhibits, the preceding exhibits are all in the appellate record. This court received and reviewed digital or electronic copies of State's Exhibits 1, 14, 15, and Defendant's Exhibit 6. Thus, we do not agree that these exhibits are missing or unplayable.

Regarding State's Exhibits 16 and 17, the trial court ordered that these exhibits be made available on request to the court of appeals in physical format because the district court lacked the technical resources or expertise to convert them into an

20

acceptable digital or electronic format for inclusion as exhibits. The clerk of this court requested these two exhibits, and, like the other exhibits, we reviewed them. Thus, Exhibits 16 and 17 are neither missing nor unplayable. Assuming for the sake of argument that the physical format of these two exhibits could be construed as somehow rendering them missing or otherwise inaccessible in some meaningful sense on appeal, Sandoval nonetheless cannot show reversible error on this basis.

As noted, Exhibits 16 and 17 are recordings of Spanish-language police interviews. Texas judicial proceedings are conducted in the English language. *Garcia v. State*, 210 S.W.2d 574, 578 (Tex. Crim. App. 1948); *Zunago v. State*, 138 S.W. 713, 719 (Tex. Crim. App. 1911). At trial, these two interviews were translated into English by a witness—the officer who conducted the interviews in Spanish— while he testified in front of the jury. As an appellate court, we cannot conduct our own independent review of the underlying Spanish-language recordings for their content or reevaluate the accuracy of the translations put before the jury. *Garcia v. State*, 887 S.W.2d 862, 875 (Tex. Crim. App. 1994); *Galvan-Cerna v. State*, 509 S.W.3d 398, 409 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Consequently, the record on appeal is the English translation made at trial. *See Galvan-Cerna*, 509 S.W.3d 408–09 (rejecting appellate complaint that would have required appellate court to accept translation other than interpreter's translation at trial); *Flores v. State*, 299 S.W.3d 843, 855–56 (Tex. App.—El Paso 2009, pet. ref'd) (stating that English-

21

language translation of foreign-language recording provided by interpreter constitutes record and "ultimately serves as the basis for any potential appeal"). Therefore, even if the Spanish-language interviews had become lost or unplayable, their unavailability would be harmless because the English translations are in the record. *See* TEX. R. APP. P. 44.2(b) (providing that appellate court must disregard non-constitutional defects and irregularities that do not affect substantial rights).

We acknowledge that the jury could have also considered the footage from the recorded interviews in assessing Sandoval's demeanor and credibility. *See Peralta v. State*, 338 S.W.3d 598, 604–06 (Tex. App.—El Paso 2010, no pet.) (indicating jury can view video from Spanish-language recording for purpose of evaluating demeanor of witnesses, but cannot interpret Spanish for themselves). But assessments of demeanor and credibility are the exclusive province of the jury, and we may not revisit them on appeal when reviewing for legal sufficiency or otherwise. *See Temple v. State*, 390 S.W.3d 341, 363 (Tex. Crim. App. 2013) (admonishing that it is jury's role to assess credibility and demeanor of witnesses and appellate court cannot usurp this role by reassessing credibility and demeanor for itself). Thus, once again, even if the recordings themselves had become lost or unplayable, the availability of the English-language translations is all that is necessary on appeal.

Finally, with respect to Sandoval's complaint about exhibit labels, she argues in particular that the digital or electronic exhibits do not conform to the filename

22

conventions imposed by the Uniform Format Manual for Texas Court Reporters. Assuming for the sake of argument that the exhibit filenames do not conform to these conventions and that this failure to conform may constitute reviewable error, any error here is not reversible because it does not affect Sandoval's substantial rights, given that the exhibits at issue are all identifiable based on their filenames and the way in which they are described by the parties in the reporter's record. *See* TEX. R. APP. P. 44.2(b) (providing that appellate court must disregard non-constitutional defects and irregularities that do not affect defendant's substantial rights).

For example, State's Exhibit 1—the surveillance footage of the collision— consists of two digital or electronic files that include the following in their filenames: "KingsleySCP_004_IP Camera 04" and "KingsleySCP_007_IP Camera 07." At trial, the two files were referred to as Camera Angle 4 and Camera Angle 7. In addition, the approximate running time of the footage from each camera was stated at trial. The other filenames are equally straightforward when viewed in the context of trial, and the number of digital or electronic exhibits admitted are also few in number, such that identifying them with the aid of the reporter's record is not a laborious chore. Accordingly, we reject Sandoval's rather hyperbolic contention that "which digital file corresponds to which exhibit is impossible to discern to any observer."

We overrule Sandoval's first issue.

23

## II.    Legal Sufficiency

Sandoval contends the evidence is legally insufficient as a matter of law to establish that she was reckless, one of the elements of the offense of manslaughter. In particular, she posits that her conduct could not constitute a gross deviation from the standard of care that an ordinary person would have exercised under the circumstances because several other motorists proceeded through the intersection while the traffic signal was red because the signal was malfunctioning at the time.

### A.    Standard of review

In reviewing a jury's verdict for evidentiary sufficiency, we must uphold its verdict if any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021). The jury's verdict is irrational under this standard only if it is based on evidence that is not legally sufficient to support a conviction. *Id.* at 655–56; *see Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016) (stating appellate court's role is not to act as thirteenth juror but rather is confined to ensuring jury's verdict is rational one that is based on more than mere modicum of evidence).

In a legal-sufficiency review, we consider all the admitted evidence and view it in the light most favorable to the verdict. *Harrell v. State*, 620 S.W.3d 910, 913–14 (Tex. Crim. App. 2021). This standard recognizes it is the jury's prerogative to resolve conflicts in the testimony, weigh the evidence, and draw reasonable

inferences from basic facts to ultimate facts. *Id.* at 914. So, we must defer to the jury's evaluation of the credibility of the witnesses and the weight to be given to various evidence. *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021).

An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013). The jury may draw inferences from the evidence so long as the evidence supports each inference. *Carter v. State*, 620 S.W.3d 147, 150 (Tex. Crim. App. 2021). When the evidence supports reasonable but conflicting inferences, we presume the jury resolved the conflict in favor of its verdict, and we defer to the jury's resolution of the conflicting inferences. *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023). However, the jury's verdict cannot rest on conjecture or speculation, which are mere theorizing or guessing about the possible meaning of the facts and evidence presented, as opposed to reasonable inferences that can be drawn from the evidence admitted at trial. *Anderson*, 416 S.W.3d at 888.

Each fact need not point directly and independently to guilt, so long as the cumulative force of all the incriminating circumstances suffices to support the jury's verdict. *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020). Thus, in our review, we must not use a divide-and-conquer strategy, evaluating individual bits of evidence in isolation, because this approach does not consider the cumulative force of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Nor

does the evidence need to negate every conceivable alternative to the defendant's guilt to be sufficient. *David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022).

The law does not require a particular type of evidence. *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). Direct and circumstantial evidence are equally probative. *Id.* Circumstantial evidence alone can be legally sufficient. *Id.* We apply the same standard of review with respect to both direct and circumstantial evidence. *Hammack v. State*, 622 S.W.3d 910, 915 (Tex. Crim. App. 2021).

### B.    Applicable law

A defendant commits the offense of manslaughter if she "recklessly causes the death of an individual." TEX. PENAL CODE § 19.04(a). But the defendant need not be the sole cause of the individual's death to commit manslaughter. *See id.* § 6.04(a) ("A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause . . . .").

Manslaughter is a result-oriented offense. *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013). Accordingly, the defendant's recklessness must relate to the result of her actions—death. *Id.*; *see also Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (stating that for murder, which is another result-oriented offense, culpable mental state must relate to result, which is causing death).

The defendant acts recklessly with respect to the result of her conduct when she is aware of but consciously disregards a substantial and unjustifiable risk that

the result will occur. TEX. PENAL CODE § 6.03(c). Manslaughter therefore entails conscious risk creation, rather than mere inattentiveness. *Stadt v. State*, 182 S.W.3d 360, 364 (Tex. Crim. App. 2005); *see also Williams v. State*, 235 S.W.3d 742, 751 (Tex. Crim. App. 2007) (characterizing recklessness as entailing calculated decision to gamble with other people's lives). Conscious risk creation may be inferred from the surrounding circumstances. *See Couthren v. State*, 571 S.W.3d 786, 793 (Tex. Crim. App. 2019) (stating jury may infer reckless driving from evidence); *see also Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020) (observing that, absent confession, defendant's mental state must be inferred from his words and actions).

Furthermore, the known risk the defendant consciously disregards "must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." TEX. PENAL CODE § 6.03(c). Whether the defendant's conduct grossly deviates from the standard of care is generally a question of fact. *Phillips v. State*, 588 S.W.2d 378, 381 (Tex. Crim. App. 1979).

Texas courts have addressed whether a given set of circumstances entailed a gross deviation in the context of automobile-related fatalities. By way of example, the Court of Criminal Appeals has held that evidence of the following circumstances was legally sufficient to prove the defendant grossly deviated from the standard of care that an ordinary person would have exercised in a given situation:

27

- an abrupt lane change without signaling and failure to maintain a proper lookout, in part due to distraction resulting from the use of a cell phone;

- a failure to properly secure a trailer being towed by a truck;

- driving at an excessive speed without regard for a red light at an upcoming intersection while engaged in street racing; and

- a failure to stop at a red traffic light while driving at a high rate of speed and in excess of the speed limit.

*Montgomery v. State*, 369 S.W.3d 188, 194–95 (Tex. Crim. App. 2012) (abrupt lane change without signaling and failure to maintain lookout); *Tello v. State*, 180 S.W.3d 150, 156 (Tex. Crim. App. 2005) (failure to secure trailer); *Graham v. State*, 657 S.W.2d 99, 101 (Tex. Crim. App. 1983) (speeding, ignoring red light, and racing); *Lopez v. State*, 630 S.W.2d 936, 940–42 (Tex. Crim. App. [Panel Op.] 1982) (failure to stop at red light while driving at excessive speed and faster than speed limit).

In general, however, the Court has indicated that a defendant's conduct need not be as egregious as the preceding examples to qualify as a gross deviation. For example, the Court has suggested that excessively speeding, standing alone, may constitute a gross deviation from the standard of care an ordinary person would exercise under a particular set of facts. *See Queeman v. State*, 520 S.W.3d 616, 630–31 (Tex. Crim. App. 2017) (noting that evidence in case failed to show motorist "grossly deviated from the standard of care, for example, by excessively speeding" and distinguishing between routine mistakes or lapses in judgment made by motorists, like mere failure to control one's speed or maintain safe interval between

vehicles, and gross deviations from ordinary standard of care involving "more extreme, aggressive, or foolish driving acts"); *see also Simms v. State*, 629 S.W.3d 218, 223–24 (Tex. Crim. App. 2021) (explaining that if defendant causes fatal collision through excessive speeding this conduct satisfies recklessness element of aggravated assault, which, like manslaughter, is result-oriented offense).

## C. Analysis

Sandoval maintains that because "many other ordinary people engaged in the exact same conduct" she did "around the same time" as her—proceeding through the intersection despite the red traffic signal—she did not grossly deviate from the standard of care that an ordinary person would exercise under the circumstances, which included the fact that a traffic signal "was stuck red for over eight minutes."

To the extent Sandoval maintains that whenever there is evidence several other motorists engaged in the exact same conduct as the defendant, this fact, in and of itself, negates the possibility the defendant grossly deviated from the standard of care an ordinary person would have exercised under the circumstances, we disagree. Consider, for example, a scenario in which multiple motorists gather to engage in street racing, an occurrence that is not uncommon in Houston. *See Tatum v. State*, Nos. 01-23-00091-CR & 01-23-00092-CR, 2024 WL 86511, at *1 (Tex. App.—Houston [1st Dist.] Jan. 9, 2024, no pet.) (mem. op.) (noting deputy's testimony that she was on patrol "as part of an initiative to police illegal street racing"). If one of

29

these motorists is involved in a fatal collision, she could not rely on the similarly unsafe driving of the other racers to establish that her conduct was not sufficiently out of the ordinary to constitute a gross deviation from the standard of care. Similarly, a motorist who strikes and kills a pedestrian as a result of excessive speed could not negate the element of recklessness simply by putting on evidence that the stretch of road she was driving is notorious for traffic traveling at excessive speeds. In short, that many motorists engage in certain conduct does not, standing alone, establish as a matter of law that this conduct is not reckless. *See Queeman*, 520 S.W.3d at 630–31 (indicating that several common behaviors engaged in by numerous drivers—excessively speeding, talking on cell phone, texting—might constitute gross deviation from standard of care ordinary person would exercise).

Turning to the circumstances of this particular case, the evidence does not show that multiple other motorists engaged in the exact same conduct as Sandoval. While multiple other motorists did proceed through the same intersection against a red traffic signal before Sandoval did, the surveillance camera footage shows that the conduct of Sandoval and these other motorists differed in several ways.

Unlike other motorists, Sandoval did not stop at the intersection and then proceed through the intersection against a red traffic signal from the forefront of the lane in which she was traveling. Instead, Sandoval was stopped three cars back from the intersection in the middle lane. She then changed lanes into the left one, which

was then unoccupied by any traffic. Though the left lane was a turn-only lane, Sandoval did not turn left. Without making a full stop, she proceeded into the intersection, steering right so that she effectively went around the two vehicles ahead of her that were stopped at the light. She then drove straight through the intersection even though cross-traffic had a green traffic signal at the time and cross-traffic was speeding toward the intersection. This cross-traffic included Watson on his motorcycle, whom one eyewitness—the motorist who initially was immediately behind Sandoval in the middle lane—described as being impossible to not see.

At trial, there was no evidence anyone else made the same series of maneuvers that Sandoval did. Of special note, there was no evidence that any other driver proceeded through the intersection against a red light while cross-traffic had a green light. Sandoval's driving conduct was unique in this regard and in other ways.

Under these circumstances, a jury could reasonably find that Sandoval grossly deviated from the standard of care an ordinary person would exercise. The Court of Criminal Appeals has indicated the question of whether conduct constitutes a gross deviation from ordinary care belongs to the jury "as long as there is some evidence of gross deviation," which the Court described as "more extreme, aggressive, or foolish driving acts than are ordinarily engaged in by drivers and accepted as reasonable risks in exchange for the social utility provided" by automobiles. *Queeman*, 520 S.W.3d at 631. The Court distinguished such gross deviations from

mundane "driving errors" that "are often made by many drivers who also accept these same risks from other drivers" as an inherent part of motorized transit. *Id.* at 630.

Sandoval's conduct before the collision included changing lanes to go around traffic stopped at a red light, entering the intersection against the red light without first coming to a full stop, driving straight through the intersection from a turn-only lane, and doing all this in quick succession while cross-traffic had a green light. As justification for this conduct, Sandoval cites the inconvenience of sitting at a red light for more than eight minutes. While that is undeniably inconvenient, the evidence at trial showed that the traffic signal in question was periodically cycling, albeit somewhat erratically, and that the left-turn signal was regularly cycling.

Viewed in their totality, we cannot say these facts establish as a matter of law that Sandoval's conduct amounted to no more than routine driving errors made by many drivers who likewise accept these same risks from other drivers as part and parcel of the costs and benefits that inhere in motorized transportation. Therefore, the question of whether Sandoval grossly deviated from the standard of ordinary care was for the jury, and the evidence is legally sufficient to support its verdict. *See id.* (advising that so long as there is some evidence of gross deviation, when viewed in light most favorable to verdict, appellate court should defer to jury's determination).

We overrule Sandoval's second issue.

**III. Interpreter Request**

Citing article 38.30 of the Texas Code of Criminal Procedure and caselaw applying it, Sandoval contends the trial court erred in denying the defense's request to appoint an interpreter to translate into English the recorded statements she made to Detective Guajardo in Spanish. She maintains that it was reversible error for the trial court to allow the jury to listen to her recorded statements in Spanish, over her timely objection, accompanied only by Guajardo's inaccurate English translation.

**A. Standard of review**

In essence, Sandoval faults the trial court for allowing the detective who interviewed her in Spanish to translate recordings of these interviews into English during his testimony as the recordings were played for the jury, rather than appointing a credentialed interpreter to translate them. We review complaints about the competency of a person to act as a translator for an abuse of discretion. *Castrejon v. State*, 428 S.W.3d 179, 188 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

**B. Applicable law**

Article 38.30 of the Texas Code of Criminal Procedure generally requires a trial court to appoint and swear in an interpreter for a witness or defendant who does not understand and speak the English language. TEX. CODE CRIM. PROC. art. 38.30(a). While this provision does not expressly address situations like the one before us, which involves foreign-language recordings admitted into evidence, the

33

Court of Criminal Appeals has held the safeguards of article 38.30 apply. *Leal v. State*, 782 S.W.2d 844, 849 (Tex. Crim. App. 1989). Therefore, upon request, an interpreter must be sworn to translate a foreign-language recording in conformity with the requirements imposed with respect to witnesses and defendants who do not understand and speak the English language. *Id.* These requirements are rather minimal though. Article 38.30 provides that "[a]ny person" may act as an interpreter, under the same rules and penalties that apply to witnesses, so long as he or she possesses "adequate interpreting skills for the particular situation." TEX. CODE CRIM. PROC. art. 38.30(a). The article does not require an interpreter to be certified or licensed to provide an admissible translation. *Castrejon*, 428 S.W.3d at 188.

### C. Analysis

The trial court did not err in implicitly ruling that Guajardo had adequate interpreting skills for the particular situation. Guajardo testified that Spanish is his first language, he had passed a departmental Spanish-language proficiency test, and he is the one who interviewed Sandoval in Spanish at the scene and at the hospital. Guajardo was on the witness stand and under oath when he translated the recordings into English for the jury, and he was subject to cross-examination by defense counsel about the accuracy of his translations. On these facts, the trial court did not abuse its discretion by allowing Guajardo to translate, rather than appointing and swearing in an interpreter who was licensed or possessed some other professional credentials.

34

*See Castrejon*, 428 S.W.3d at 186, 188–89 (concluding that trial court did not err by allowing peace officer to translate parts of recorded interview she had conducted from Spanish into English while testifying before jury over defendant's objection that recording could not be admitted without "proper certified interpreter"); *see also Mendiola v. State*, 924 S.W.2d 157, 161–63 (Tex. App.—Corpus Christi 1995, pet. ref'd) (upholding trial court's ruling that bailiff was qualified to interpret for defendant on trial for murder and court's refusal to appoint another over defendant's objection that he wanted interpreter who could provide word-for-word translation).

To the extent Sandoval disputes the accuracy of Guajardo's translation, disputes about the accuracy of a translation present an issue for the jury to resolve. *See Garcia*, 887 S.W.2d at 875 (holding accuracy of translation "is a factual question which ultimately only the jury can answer"). Sandoval's trial counsel challenged the accuracy of Guajardo's translation through cross-examination, which is a proper means of challenging ostensible translation inaccuracies. *See id.* (stating that accuracy of translation must be impeached through cross-examination or by some other means during trial). On appeal, we cannot independently reassess the accuracy of Guajardo's translation. *See id.* (holding that defendant cannot preserve error by objecting to accuracy of particular translation in trial court and appellate complaints about accuracy of translation therefore present nothing for review).

We overrule Sandoval's third issue.

## IV.   Written Translation

Citing Rule 1009 of the Texas Rules of Evidence, Sandoval contends the trial court erred in denying admission of a sworn, written English translation of one of the two recorded interviews she gave to Detective Guajardo. Specifically, Sandoval maintains that the trial court should have admitted into evidence a written translation made by Sarah Hudson of the second interview that took place at the hospital.

### A.   Standard of review

We review a trial court's evidentiary rulings, including those involving the admissibility of foreign-language translations under Rule 1009 of the Texas Rules of Evidence, for an abuse of discretion. *Castrejon*, 428 S.W.3d at 184.

### B.   Applicable law

Rule 1009 of the Texas Rules of Evidence provides that a translation of a foreign-language document is admissible, so long as its proponent serves on all parties the translation, the document being translated, and a qualified translator's affidavit setting forth her qualifications and certifying the translation's accuracy at least 45 days before trial. TEX. R. EVID. 1009(a). But on a party's motion and for good cause, the trial court may alter this deadline. TEX. R. EVID. 1009(f). Moreover, this deadline does not bar a party from offering the testimony of a qualified translator to translate a foreign-language document. TEX. R. EVID. 1009(e); *Castrejon*, 428

S.W.3d at 184–85. Finally, though Rule 1009 refers to documents, we apply it to translations of foreign-language recordings too. *Castrejon*, 428 S.W.3d at 183–86.

### C.     Analysis

The recorded Spanish-language interview at issue predated Sandoval's indictment. She did not satisfy the pretrial deadline by serving a copy of her proposed translation and the other required papers on the prosecution 45 days before trial. *See* Tex. R. Evid. 1009(a). Because Sandoval did not satisfy the rule's deadline for introducing the affidavit into evidence, the trial court's decision to exclude the affidavit was neither arbitrary nor without reference to guiding rules or principles.

Moreover, Sandoval still had the option of calling the interpreter in question, Hudson, as a trial witness to translate the interview from Spanish into English in the same manner that the State had done during Guajardo's testimony. *See* Tex. R. Evid. 1009(e). But Sandoval did not do so, and has not explained why she did not. Having foregone this opportunity, she cannot show the trial court's refusal to admit the written translation affected her substantial rights. *See* Tex. R. App. P. 44.2.

We overrule Sandoval's fourth issue.

## V.     Expert Testimony

Sandoval contends the trial court erred in excluding expert testimony from five defense witnesses that bore on the subject of concurrent causation, that is, other

possible causes of the collision. Sandoval maintains that the trial court's exclusion of this evidence violated the rules of evidence and her right to due process of law.

Sandoval has waived this complaint. First, she does not identify anywhere in the record where she asserted a due-process violation in the trial court, and due-process complaints not made in the trial court are waived on appeal. *See Clark v. State*, 365 S.W.3d 333, 339–40 (Tex. Crim. App. 2012) (holding defendant forfeited denial-of-due-process claim by not properly preserving error on issue at trial). Second, Sandoval's appellate brief merely outlines the basic contours of her evidentiary and due-process complaints. The brief lacks substantive discussion of these issues, accompanied by appropriate citation of supporting authorities, and Sandoval therefore has not preserved these issues for review on appeal. *See* Tex. R. App. P. 38.1(i) (requiring appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities"); *Bohannan v. State*, 546 S.W.3d 166, 179–80 (Tex. Crim. App. 2017) (declining to address due-process complaint due to conclusory nature of briefing unsupported by authority).

We overrule Sandoval's fifth issue.

**CONCLUSION**

We affirm the trial court's judgment.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Landau, and Hightower.

Justice Landau, concurring in the judgment without separate opinion.

Do not publish. TEX. R. APP. P. 47.2(b).